RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0113P (6th Cir.)
File Name: 03a0113p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

No. 01-4248
LISA BUKOWSKI et al.,
*Plaintiffs-Appellees,*

*v.*

CITY OF AKRON et al.,
*Defendants,*

PATRICK SUMMERS and JOHN URBANK,
*Defendants-Appellants.*

Nos. 01-4248/4335

No. 01-4335
LISA BUKOWSKI et al.,
*Plaintiffs-Appellants,*

*v.*

CITY OF AKRON,
*Defendant-Appellee,*

PATRICK SUMMERS et al.,
*Defendants.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 01-01075—James S. Gwin, District Judge.

Argued: October 30, 2002

Decided and Filed: April 16, 2003

Before: SILER and MOORE, Circuit Judges; McKINLEY,
District Judge.[*]

---

**COUNSEL**

**ARGUED:** John C. Reece, CITY OF AKRON, DEPARTMENT OF LAW, Akron, Ohio, for Defendants. Gordon S. Friedman, FRIEDMAN & GILBERT, Cleveland, Ohio, for Plaintiffs. **ON BRIEF:** John C. Reece, Bruce H. Christensen, Jr., CITY OF AKRON, DEPARTMENT OF LAW, Akron, Ohio, for Defendants. Gordon S. Friedman, FRIEDMAN & GILBERT, Cleveland, Ohio, William T. Whitaker, Akron, Ohio, for Plaintiffs.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. Lisa Bukowski (and her parents as her guardians and in their own right) sued the City of Akron as well as some of its officials for delivering Bukowski into the hands of Leslie Hall, a man who later raped her. The district court denied the officials qualified immunity, but held that the City of Akron itself was entitled to summary judgment. In No. 01-4248, the city

---

[*] The Honorable Joseph H. McKinley, Jr., United States District Judge for the Western District of Kentucky, sitting by designation.

officials appeal the denial of qualified immunity, and in No. 01-4335, the Bukowskis appeal the grant of summary judgment to the City. We hold that the Bukowskis have not made out a constitutional violation against the officials or the City. We therefore **REVERSE** the district court's denial of qualified immunity, **AFFIRM** its grant of summary judgment to the City, and **REMAND** the case to dismiss the officials and the City from the lawsuit, allowing the Bukowskis to proceed only against defendant Hall.

## I. BACKGROUND

The tragic facts of this case are not in dispute. At the time the events took place, the Bukowskis were living together as a family in Avoca, Pennsylvania. Lisa Bukowski ("Bukowski"), who was nineteen years old at the time, was mentally disabled but was not under a guardianship of any kind. Bukowski was diagnosed as being mentally disabled when she was a year old. Her functioning is impaired in many ways. Her mother explained that she cannot cook, clean, or manage her financial affairs. She also has a tendency to ask the same questions repeatedly; her mother testified in deposition that "her brain just forgets quickly." Joint Appendix in No. 01-4248 ("J.A.") at 274. She has trouble understanding cursive handwriting and so can only read texts that are typed. On the other hand, Bukowski can function competently in a number of areas. She graduated from the special education program in her public high school, making moderately good grades. She is quite proficient at using the computer and the Internet and has worked as a volunteer at an adult care facility, playing games and talking with the elderly residents there and cleaning dishes. She has not, however, ever had a full-time paying job.

Sometime prior to May of 1999, Bukowski began talking online to a thirty-nine year old man, Leslie Hall. Hall told her that he was a disabled eighteen-year-old and encouraged her to come to Akron, Ohio to visit him. Never having met him before, Bukowski left home before dawn on May 8, 1999,

taking a series of cabs and buses to reach Hall. At his place and far from her home, Hall repeatedly raped Bukowski.

After realizing that Lisa Bukowski had disappeared, Stanley and Robyn Bukowski began searching for their daughter. They called the Avoca Police Department, and with their help, they deduced that she had taken a taxi to a bus station and then traveled to Akron. The Bukowskis found an email from Hall and, with the assistance of the Avoca Police Department and America Online, traced it to a physical address on May 10, 1999. The Avoca Police Department contacted the Akron Police Department, asking the officers there to help in locating a missing person. The Avoca officers explained that Bukowski was mentally disabled and nineteen, and gave the Akron Police Department Hall's address. The Avoca officers relayed a message from the Akron police to the Bukowskis that the Akron police would hold her until her parents arrived. Meanwhile, the Bukowskis began driving to Akron, which was between eight and nine hours away. The Akron Police Department dispatched police officers at around midnight on May 11, 1999, to pick Bukowski up from Hall's place. The officers met Bukowski and Hall at Hall's residence, and they convinced Bukowski to come with them to the police station.

Upon arriving at the Akron police station, Bukowski met with Officer John Urbank, a detective on the police force. Urbank briefly assessed Bukowski and recognized (chiefly because of her speech impediment) that she was a bit "slow." J.A. at 203. Urbank eventually concluded, however, that Bukowski had to "have some degree of . . . ability to take care of herself" because she had traveled to Akron from Eastern Pennsylvania all by herself and had demonstrated some level of reading and writing ability in having met someone in an Internet chat room. J.A. at 201. When Urbank probed Bukowski about her relationship with Hall, she spoke favorably of him, calling him her boyfriend and asking repeatedly both to call him and to be returned to his residence. Bukowski testified in deposition and at Hall's criminal trial

that she never told police either that she had sex with Hall or that he hurt her in any way. Bukowski also admits that she never told police that Hall was twenty years older than she was. Bukowski did, however, make remarks suggesting that she left Avoca to escape abuse from her parents. After a brief interview, Urbank sent Bukowski to interview with a victims advocate from the Victim's Assistance Program, Kimberly Heishman-Donahue. Heishman-Donahue also was clearly misled by Bukowski's statements about Hall — in her report, Heishman-Donahue concluded that she faced no risk of harm.

While Bukowski was meeting with Heishman-Donahue, Urbank called Defendant Patrick Summers, an Akron prosecutor and police legal advisor, to determine whether the Akron Police Department should hold Bukowski until her parents arrived. In two telephone conversations, Summers advised Urbank that the police had no legal authority to detain Bukowski and that they should therefore release her, if she insisted on leaving. Summers and Urbank considered committing Bukowski to the Summit County Children's Service Board under Ohio Juvenile Rule 6, but believed it inappropriate because Bukowski was nineteen years old and the Akron police had no paperwork confirming either her mental disability or that she was under a guardianship. Summers and Urbank also considered referring Bukowski to PEERS, a psychiatric service, but considered it also to be inappropriate because Bukowski was not a mentally ill person subject to hospitalization as required by state law. After considering and rejecting these options, Urbank explained to Bukowski that she could either wait at the police station or go to a shelter; Urbank did not offer Hall's residence as an option. Nevertheless, Bukowski stated that she wanted to return to Hall. Thus, at approximately 4:30 a.m., upon her request, the police returned Bukowski to Hall's residence.

When the Bukowskis arrived in Akron and picked up their daughter from Hall's residence, they learned that she had been repeatedly raped by Hall, both before and after she had been picked up by police. Bukowski was taken to a hospital, and based on that examination, officials filed rape and kidnaping charges against Hall.

Plaintiffs Lisa, Robyn, and Stanley Bukowski subsequently initiated this action against the City of Akron, Summers, Urbank, and Hall. The plaintiffs alleged that Urbank and Summers violated Lisa Bukowski's substantive due process rights and her parents' constitutional rights to the companionship of their daughter. The plaintiffs included a claim of intentional infliction of emotional distress against the two officials. The plaintiffs also sued the City of Akron, claiming that it was responsible for the officials' constitutional violations because it failed adequately to train Urbank and Summers. The district court granted Urbank and Summers summary judgment on the claim of intentional infliction of emotional distress but denied summary judgment on the constitutional claims. The district court granted the City of Akron summary judgment on all claims, holding that the plaintiffs could not make out a failure-to-train claim under *City of Canton v. Harris*, 489 U.S. 378 (1989). Summers and Urbank appeal the denial of summary judgment on the basis of qualified immunity in No. 01-4248. The Bukowskis appeal the grant of summary judgment to the City in No. 01-4335.

## II. ANALYSIS

### A. Jurisdiction

The district court below had jurisdiction under 28 U.S.C. § 1331. This court has jurisdiction over Summers's and Urbank's appeal of the district court's denial of qualified immunity pursuant to 28 U.S.C. § 1291 and *Mitchell v. Forsyth*, 472 U.S. 511 (1985). The plaintiffs argue that this court does not have jurisdiction because there are material facts in dispute. However, because the defendants argue that the plaintiffs' facts are legally insufficient (rather than factually untrue), this court has jurisdiction. *See Klein v. Long*, 275 F.3d 544, 549 (6th Cir. 2001), *cert. denied*, 123 S. Ct. 95 (2002) (noting that as long as "a defendant seeking

qualified immunity [is] willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case," the defendant is entitled to an interlocutory appeal to show that "the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail[s] to establish a prima facie violation of clear constitutional law").

This court also has jurisdiction over the Bukowskis' appeal of the district court's grant of summary judgment to the City of Akron. The district court granted the plaintiffs' motion for the entry of final judgment on their claim of municipal liability. This order is both an "express determination that there is no just reason for delay" and "an express direction for the entry of judgment" under Federal Rule of Civil Procedure 54(b), making it a final judgment and thus appealable under 28 U.S.C. § 1291.

## B. Standard of Review

We review de novo a district court's denial of qualified immunity. *Klein*, 275 F.3d at 550. We also review de novo a district court's grant of summary judgment. *Ewolski v. City of Brunswick*, 287 F.3d 492, 500 (6th Cir. 2002). Summary judgment is proper only when there is no dispute as to a material question of fact and one party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "Viewing all facts and inferences drawn therefrom in the light most favorable to the nonmovant, this court then determines whether the evidence presented is such that a reasonable jury could find for that party." *Ewolski*, 287 F.3d at 500.

## C. Qualified Immunity for City Officials

The primary issue in this case is whether Urbank, Summers, and the City of Akron violated the Bukowskis' constitutional rights through their roles in the injuries that Bukowski received at Hall's hands. In particular, the Bukowskis assert that the defendants violated Lisa Bukowski's due-process rights, as well as Stanley and Robyn Bukowski's parental rights. Since a constitutional violation against a city requires

(but is not made out by) an antecedent violation on the part of its officials, we start with the roles played by defendants Urbank and Summers.

As governmental officials acting within the scope of their duty, Urbank and Summers can claim qualified immunity. Qualified immunity is an affirmative defense shielding governmental officials from liability as long as their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The key question is whether "the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct." *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). The qualified-immunity inquiry has two principal parts. First, the court must determine "whether the plaintiff has shown a violation of a constitutionally protected right." *Davis v. Brady*, 143 F.3d 1021, 1024 (6th Cir. 1998), *cert. denied*, 525 U.S. 1093 (1999). Then the court must discern whether the right is so "clearly established that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). We start with the question of whether the officials violated Lisa Bukowski's due-process rights at all; answering that question in the negative, we do not reach the clearly-established prong.

### 1. *DeShaney* and the Question of State Action

The Bukowskis seek to hold government officials responsible for the acts of private violence Bukowski suffered at the hands of Hall, who was convicted of his crimes and imprisoned by the State. Generally, however, "the Due Process Clause does not impose liability on the State for injuries inflicted by private acts of violence." *Ewolski*, 287 F.3d at 509.

The Supreme Court addressed the state-action requirement in this context in *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989). In *DeShaney*, the Court held that the Winnebago County Department of Social Services could not be held liable for the injuries inflicted on a young child by his father, even though it was the Department's general responsibility to prevent child abuse and the Department had, in fact, returned the child to his father's house after having taken temporary custody of him. While the Court in *DeShaney* denied relief, it took care to explain that it was not considering a case where a person suffered injuries either while in state custody or because of state acts that made him more vulnerable to private violence. *Id.* at 201. Instead, *DeShaney* involved a situation where the state's involvement placed the ultimate victim "in no worse position than that in which he would have been had it not acted at all." *Id.*

This court has recognized both of the above exceptions to *DeShaney*'s general rule. We have held that the Due Process Clause makes an injury suffered in state custody constitutionally cognizable. *See Stemler v. City of Florence*, 126 F.3d 856, 867-68 (6th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998). We have also recognized that liability under the Due Process Clause can be predicated on "affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *see also Ewolski*, 287 F.3d at 509 (requiring an act that "directly increase[s] the vulnerability of citizens to danger"). The question here is whether the Bukowskis can come within the exception, elucidated in *Kallstrom*, for state-created (or state-heightened) dangers.[1]

---

[1] The Bukowskis argue that their claim should be treated under the custodial exception to *DeShaney*. It is clear, however, that there was no custody here. There was no "intentional application of physical force and show of authority made with the intent of acquiring physical control." *Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002). In fact,

It seems difficult to characterize the actions of the officials as affirmative acts within the meaning of *DeShaney*. The officials arguably did nothing to increase Bukowski's vulnerability to danger. They merely returned her at her request to Hall's residence, where they originally had found her. The Bukowskis argue that the police did not merely refuse to act: instead of simply allowing her to leave the police station, they affirmatively acted by returning her to Hall's residence.

Whether or not the defendants "acted" may be a difficult question in the abstract, but *DeShaney* makes clear that the acts of the officials here clearly fall on the inaction side of the line. Although in *DeShaney* the state returned Joshua to the ultimate aggressor, the *DeShaney* Court explicitly rejected the idea that such acts met the state-action requirement. *See DeShaney*, 489 U.S. at 201 ("That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all."). The Court in *DeShaney* was not merely assuming that state actors did not contribute to the hazards faced by Joshua, but it was also holding that the act of returning someone to the same dangers that existed status quo ante does not satisfy the state-action requirement.

Examining the quality of governmental involvement here, it is apparent that the government was no more involved in making Bukowski more vulnerable to private violence than it was in *DeShaney* — in both cases, the government was merely returning a person to a situation with a preexisting danger. The plaintiffs' argument that the officials encouraged Hall by their act of returning Bukowski is really the same as the argument that the officials encouraged Hall by their refusal to get involved.

---

this is precisely what the Bukowskis are complaining about. Their argument is essentially that the police officials should have taken custody of Lisa Bukowski but did not.

In reality, the facts in *DeShaney* compare favorably to those the plaintiffs allege in this case. *DeShaney* involved a transfer of custody of a child by state actors who may have had actual knowledge of the danger faced by the child. This case, in contrast, involves an (admittedly mentally disabled) adult and governmental officials who did not have any knowledge of the dangers facing her. Additionally, while Joshua was forcibly transferred to his father's care by act of law, Bukowski was transported to Hall's residence because the officials were accommodating Bukowski's own wishes. Any attempts to distinguish *DeShaney* inevitably favor the defendants, not the plaintiffs.

## 2. *DeShaney* and the Question of State Culpability

Even if there were sufficient state action here, the Bukowskis' claim still must fail. For in addition to showing the requisite state action, the Bukowskis must show the requisite state culpability necessary for a Due Process Clause action. *See Ewolski*, 287 F.3d at 510 (noting that it is not sufficient that the plaintiffs show a "causal connection between state action and an act of private violence," but that they also "must demonstrate that the state acted with the requisite culpability to establish a substantive due process violation").

Plaintiffs alleging due-process violations generally must show that the challenged action was "so 'egregious' that it can be said to be 'arbitrary in the constitutional sense.'" *Id.* (citation omitted). This standard, however, is "'no calibrated yard stick.'" *Id.* (citation omitted). In the custodial context, we have required plaintiffs to make a showing of deliberate indifference. *See Stemler*, 126 F.3d at 870. We initially speculated in *Stemler* as to "whether even deliberate indifference by state actors could give rise to a substantive due process claim by a plaintiff who was not in the custody of the state." *Id.* at 869. After reviewing the Supreme Court's decision in *City of Sacramento v. Lewis*, 523 U.S. 833 (1998), however, we have come to view the justification for a

heightened standard in noncustodial cases as coming from the fact that the reasoning in noncustodial situations is often, by necessity, rushed. *Ewolski*, 287 F.3d at 511 n.5. The guiding principle seems to be that a deliberate-indifference standard is appropriate in "settings [that] provide the opportunity for reflection and unhurried judgments," but that a higher bar may be necessary when opportunities for reasoned deliberation are not present. *Id.*; *see also Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (holding that an injured bystander in a police shootout must prove not just deliberate indifference on the part of the police officers but must also show that they acted "maliciously and sadistically for the very purpose of causing harm").

For the case at bar, a deliberate-indifference standard is clearly the appropriate one, given the fact that the defendants not only had time to deliberate on what to do with Bukowski but actually did deliberate on this point. The plaintiffs here, however, cannot meet that standard. We have interpreted deliberate indifference, in this context, as being similar to subjective recklessness. *Sperle v. Michigan Dep't of Corr.*, 297 F.3d 483, 493 (6th Cir. 2002) (citing *Ewolski*, 287 F.3d at 509). Pursuant to this definition, the official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Subjective recklessness can, however, be proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it. *Ewolski*, 287 F.3d 513 n.7.

Under this standard and under the facts as the Bukowskis allege them, the officials could not be considered deliberately indifferent to Lisa Bukowski's needs. Urbank and Summers did know that Bukowski was a nineteen-year-old mentally disabled woman who had traveled hundreds of miles to meet a man she had met on the Internet. They were ignorant, however, of many facts that are apparent now only in hindsight. They did not have any knowledge that Hall was

dangerous or that he had earlier raped Bukowski. Nor, contrary to the plaintiffs' claims, did they have significant reason to believe that he was dangerous. Bukowski, both in conversation and in demeanor, gave Urbank and Summers no reason to believe that she needed to be detained for her own safety. From the moment she arrived, Bukowski spoke of Hall as her boyfriend. While this suggested some kind of romantic relationship, nothing about it suggested anything non-consensual or violent. In fact, it suggested that Bukowski was safe with Hall, which was consistent with her comments that it was not Hall, but her parents, that were abusive. Bukowski asked permission to call Hall — not her parents — and repeatedly insisted on being returned to his residence. Bukowski also never mentioned that Hall was twenty years older than she was.

Moreover, Urbank's knowledge of the extent of Bukowski's disability appears to have been quite limited. Urbank clearly recognized that she was a bit slow and that she had a learning disability. But Urbank also knew that she had managed to travel several hundred miles by herself, taking a series of cabs and buses, to reach Hall. Urbank knew that she had to be at least somewhat skilled with money to be able to pay for those transportation services, and he also knew from the fact that she and Hall met over the Internet that she was able to type and was at least moderately skilled with a computer.

Urbank clearly attempted to gauge Bukowski's level of functioning and the threats to her safety by analyzing her past actions, her current demeanor, and her account of the facts. Urbank personally interviewed Bukowski and then sent her to meet (for roughly two hours) with a representative from the Victim's Assistance Office. Operating with the facts that Bukowski gave them and with the facts they could infer from meeting her, Urbank and Summers would not have been aware of the facts from which it could be deduced that a substantial risk of serious harm existed. Nor was such harm so obvious that Urbank and Summers could be presumed to

have consciously known about it. In these circumstances, Bukowski cannot make out this element of her due-process claim.

### 3. *DeShaney* and the Question of Unavoidable Liability

The plaintiffs do not mention the dangers that the officials would have faced if they had chosen to restrain Bukowski. For an official cannot, of course, detain a person without justification. *See, e.g.*, *Bennett v. Ohio Dep't of Rehab. & Corr.*, 573 N.E.2d 633, 636 (Ohio 1991) (noting that, under Ohio law, false imprisonment is established if "a person confines another intentionally 'without lawful privilege and against his consent'") (citation omitted); *Adams v. Metiva*, 31 F.3d 375, 383 (6th Cir. 1994) (noting that "if there is no reason to further detain a person, he cannot lawfully be detained against his will").

The plaintiffs have not pointed to any legal rationale that would authorize the officials to hold Bukowski. The plaintiffs point to Ohio Juvenile Rule 6, which allows the police to take "children" into custody. *See* OHIO REV. CODE ANN. § 2151.31 (codifying OH. ST. JUV. P. RULE 6). The term "child," however, is statutorily defined as "a person who is under eighteen years of age." OHIO REV. CODE ANN. § 2151.011(B)(5). Bukowski, at the time of the incident, was nineteen and not under a guardianship of any kind. The plaintiffs next suggest that Bukowski should have been held for psychiatric hospitalization. They are correct when they argue that the police are allowed to hold the mentally incapacitated against their will. Yet, Ohio law requires that there first be a showing of "a mentally ill person subject to hospitalization" who presents a "substantial risk of physical harm to self or others if allowed to remain at liberty pending examination." OHIO REV. CODE ANN. § 5122.10. The plaintiffs do not even allege that Bukowski can fit such restrictive criteria.

The plaintiffs argue that Urbank should have stretched the boundaries of these categories, perhaps by interpreting the juvenile rules to cover mentally disabled adults or by loosely construing the psychiatric-hospitalization requirements. This argument, however, reveals the difficult situation in which the officials here found themselves. By failing to detain Bukowski, they face this lawsuit. If they had chosen to detain her, they may have faced another lawsuit based on charges of false imprisonment. Under the legal theory adopted by the plaintiffs, the defendant officials would have violated the Constitution no matter how they acted. The Supreme Court has warned specifically against our placing governmental officials in such a position. *See DeShaney*, 489 U.S. at 203 (noting that if the defendants had "moved too soon to take custody of the son away from the father, they would likely have been met with charges of improperly intruding into the parent-child relationship, charges based on the same Due Process Clause that forms the basis for the present charge of failure to provide adequate protection").

Based on the above analysis, it is clear that the plaintiffs cannot show that the Akron officials here violated Lisa Bukowski's substantive right to due process.[2] This may seem

---

[2] We must note that the parents have also brought a parental-rights claim under the doctrine of *Stanley v. Illinois*, 405 U.S. 645 (1972). To recover on this claim, the plaintiffs must overcome the same state action and state culpability problems that they face with regard to showing a general due-process violation. As we have concluded, this is a hurdle the plaintiffs cannot jump. We note, however, that there may be a separate bar in this circuit to such a claim. *See Purnell v. City of Akron*, 925 F.2d 941, 948 n.6 (6th Cir. 1991) (leaving unresolved the "difficult question" of whether state-created wrongful death of a family member is a cognizable injury under § 1983). In any event, parental rights are unlikely to stretch this far. *See Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir. 1991) ("[M]ost courts which have recognized a protected right to familial association, and allowed parents or their children to recover under § 1983 for alleged unconstitutional conduct primarily directed toward another family member have done so only where the plaintiffs have alleged a permanent, physical loss of association of an immediate family member as a result of unlawful state action.").

at first glance to be a harsh result. The plaintiffs stress that Bukowski's mental disability made her functionally like a child. They argue that the officials simply should not have acceded to Bukowski's wishes when she requested to be returned to Hall's residence. Under the law announced in *DeShaney*, however, officials have a constitutional obligation only to refrain from actively increasing an individual's susceptibility to private violence. They do not have a constitutional obligation to prevent such violence, and, in fact, they did not even possess legal authority under state law to intervene by detaining Bukowski. Moreover, given the knowledge that they had at the time they made the decision to let her go, it does not seem that they were aware of facts that would suggest that a substantial risk of serious harm existed. For these reasons, we hold that the officials Urbank and Summers should have been granted qualified immunity.

## D.  The Municipal Claim

We now turn to the plaintiffs' claim against the City of Akron. Because the City of Akron can only be held liable if there is a showing of liability on the part of its officials, the determination that the City's officials did not violate the plaintiffs' constitutional rights resolves the claim against the City as well. *See Scott v. Clay County*, 205 F.3d 867, 879 (6th Cir. 2000) (noting that the "conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well").

## III.  CONCLUSION

In summary, we hold that the Bukowskis cannot show any constitutional violation by City of Akron officials or by the City itself. As a result, we **REVERSE** the district court's denial of qualified immunity to the officials Urbank and Summers in case No. 01-4248 and **AFFIRM** its grant of summary judgment to the City of Akron in case No. 01-4335. We **REMAND** the case to the district court so that it may

dismiss the officials and the City from the lawsuit, allowing the Bukowskis to proceed only against defendant Hall.