**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0236n.06

**No. 09-1158**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Apr 16, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| OMIMEX ENERGY INC., ET AL., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF MICHIGAN |
| JOYCE G. BLOHM, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before:  MOORE and COOK, Circuit Judges; LUDINGTON, District Judge.[*]

LUDINGTON, District Judge.  Defendant Joyce G. Blohm, and her now-deceased husband, Homer, granted a mineral deed to the Miller Brothers Oil Corporation in 1983 for a term of twenty years, or as long thereafter as gas or oil were "being produced" or "capable of being produced from wells drilled during the 20 year term."  It is undisputed that no qualifying well was drilled on the Blohms' property during the twenty-year term.  Nevertheless, Plaintiff Omimex Energy, the Miller Brothers' successor in interest, contends that later agreements between the parties modified the condition such that a well drilled in 1980, which began producing in 2002, satisfies the modified condition.  Joyce Blohm contends the deed was never modified, and the plain language of the condition was never satisfied.

---

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

The district court initially denied Blohm's motions to dismiss and for summary judgment, concluding that later agreements demonstrated the parties' understanding that the condition had been satisfied. Op. & Order, Sept. 19, 2006. The district court reversed course one year later, however, and granted Blohm's second summary judgment motion based on the plain language of the condition. Op. & Order, Nov. 15, 2007. The district court noted that Omimex had not advanced any evidence to support its position beyond the deed itself and its interpretation of several ambiguous agreements that were later entered into by the parties. Those agreements, the district court held, were insufficient to demonstrate mutual assent to a modification of the deed. For the reasons stated below, the district court's decision will be affirmed.

**I**

In the 1970s and early 1980s, oil and natural gas companies were beginning to purchase mineral leases in western Michigan's Oceana County, intending to exploit the extensive natural gas reserves underlying the area's forests and farmlands. The gas in Oceana County was "sour," meaning it was contaminated with toxic hydrogen sulfide, and needed to be "sweetened" before it would be marketable. The sweetening process required transporting the sour gas by pipeline about fifty miles north to a plant near Manistee. At the time of the transactions at issue in this case, the pipeline had not been extended into southern Oceana County, and the natural gas in the area was not marketable.

In 1981, Amoco renewed a mineral lease, originally granted in 1976, for the oil, gas, and minerals underlying the Blohms' 200-acre farm in Claybanks Township. The primary term of the lease concluded on December 7, 1983, but the lease would be automatically extended if mineral production took place on the land during the primary term. Amoco also held a lease on the minerals underlying an adjacent property to the south, which was owned by the Blohms' neighbors, the Foxes. In 1980, Amoco drilled a well known as the Miller-Fox 1-11 on an eighty-acre parcel owned by the Foxes' that was adjacent to the Blohms' farm. In early 1983, about a year before the 1981 lease would expire, Amoco petitioned the Michigan Supervisor of Wells to establish a 160-acre "drilling unit" for the Miller-Fox 1-11, which would include the southernmost eighty acres of the Blohms' farm and the adjacent eighty-acre parcel of the Foxes' property on which the Miller-Fox 1-11 had been drilled.

A "drilling unit" is "the maximum area that may be efficiently and economically drained by 1 well." Mich. Comp. Laws § 324.61513(2). To limit "waste," only one well may be drilled per drilling unit. *See* Mich. Comp. Laws §§ 324.61501(q), .61502, .61513(3). Consequently, if the Blohms' southernmost eighty acres were pooled with the Foxes' eighty-acre parcel into a single drilling unit, the Blohms would be prohibited from drilling a well on the portion of their property that was within the drilling unit.[1]

---

[1]The land had previously been classified as two 80-acre drilling units pursuant to Special Order 1-73(Mar. 1, 1973), *available at* http://michigan.gov/documents/deq/ogs-oilandgas-spacing-1-73_258023_7.pdf, which set standardized drilling units for much of northern and western Lower Michigan at 80 acres each.

The Blohms, however, remained interested in developing a well on their own property, and began negotiating development plans with the Miller Brothers Oil Corporation, who held a similar interest, in late 1981. Blohm Aff. ¶ 7. On April 16, 1983, the Blohms agreed to terms with the Miller Brothers, granting a mineral deed intended to facilitate development of a well on their farm. The deed conveyed, subject to the existing Amoco lease, an undivided one-half interest in the minerals underlying the Blohms' farm[2] to the Miller Brothers Oil Corporation "for a term of 20 years or as long thereafter as oil, gas or other hydrocarbons are being produced or are capable of being produced from wells drilled during the 20 year term." The deed was signed two-days before the Supervisor of Wells was scheduled to conduct a hearing on Amoco's proposed drilling unit for the Miller-Fox 1-11. It gave the Miller Brothers,[3] who paid $250,000 for the deed and wanted to drill a well on the Blohms' farm, a significant interest in the supervisor's decision.

On April 18, 1983, the Supervisor of Wells for the State of Michigan held a hearing to determine the appropriate drilling unit for the Miller-Fox 1-11. *See* Mich. Comp. Laws § 324.61507. Homer Blohm and the Miller Brothers traveled to Lansing, along with the neighboring landowner, Mr. Fox, to oppose the expanded drilling unit and the accompanying limitations on drilling. Blohm Aff. ¶ 12. If adopted, the drilling unit would combine the minerals in the N 1/2 of the SW 1/4 of Section 11, which the Blohms and Miller Brothers owned, with the minerals in S 1/2 of the SW 1/4

---

[2]The deed provides the following legal description of the property "Section 11: N/2 of SW/4; S/2 of NW/4; and NE/4 of NW/4."

[3]The phrase "Miller Brothers" is used to refer to the Miller Brothers Oil Corporation and related entities.

of Section 11, which the Foxes owned, into a single 160-acre drilling unit serviced by the existing Miller-Fox 1-11 well. Amoco held a mineral lease covering all the minerals in the unit and also owned the well. In a May 9, 1983 opinion, the Supervisor granted Amoco's request, ruling against the Blohms and Miller Brothers. The Supervisor decided that the entire 160 acres in the southwest quarter of Section 11 could be drained by the Miller-Fox 1-11, and drilling additional wells would be a "waste." Op. & Order of the Supervisor of Wells, No. (A) 6-3-83. The decision made it more difficult for the Blohms and Miller Brothers to drill a well on the Blohms property, because it meant that only 120 acres of the 200-acre farm remained available for drilling.

Nevertheless, on May 13, 1983, four days after the Supervisor's opinion was issued, the Blohms and Miller Brothers signed an amended letter agreement, specifying that the Blohms had been paid in full for the one-half mineral interest they deeded to the Miller Brothers. The Blohms and Miller Brothers recorded the deed with the Oceana County Register of Deeds the same day. *See* Aff. of Joyce Blohm ¶ 11; Mineral Deed. The deed granted the Miller Brothers an ownership interest in the minerals, subject to the twenty-year production contingency and the 1981 lease to Amoco.

Beginning in March 1984, the Miller Brothers and Blohms commenced efforts to terminate the Amoco lease and remove the Blohms' eighty-acre parcel from the Miller-Fox 1-11 drilling unit. Blohm Aff. ¶¶ 16–17. First, on March 9, the Blohms leased the remaining mineral interests in their property to the Miller Brothers for a primary term of one year, and as long thereafter as the Miller Brothers engaged in drilling or mineral production on the land. The lease was signed despite apparent ambiguity about whether the 1981 lease to Amoco was still effective. The primary term

of the 1981 lease had expired in December of 1983, but questions about whether its production requirement had been satisfied by the pooling of the Blohm and Fox tracts into a single drilling unit remained. Next, on March 12, the Blohms filed a declaration asserting that the terms of the 1981 Amoco lease had been broken, and as a result, Amoco's leasehold interest had been forfeited. Amoco disputed the Blohms' declaration in a March 29 response. The March declarations were followed by an August 21, 1984 lawsuit, in which the Blohms and Miller Brothers asserted that the lease had expired. Complaint, *Blohm v. Amoco Prod. Co.*, No. 84-2542 (Cir. Ct. Oceana County Aug. 21, 1984). The lawsuit was filed by the Miller Brothers on behalf of the Blohms and the Miller Brothers Oil Corporation, and asserted that the Amoco lease had expired following completion of the primary term on December 7, 1983. *Id.* ¶ 6. Amoco, however, disagreed, asserting that the combination of the Blohms' southernmost eighty acres with the Foxes' northernmost eighty acres into the Miller-Fox 1-11 drilling unit constituted production of gas from the leased land and automatically renewed the lease. *Id.* ¶ 7; Amoco Decl. (Mar. 29, 1984).

The Miller Brothers and the Blohms were both named plaintiffs in the 1984 suit, as they each owned an undivided one-half interest in the minerals underlying the Blohms farm. The case, however, was prosecuted only by the Miller Brothers on both parties' behalf. Pursuant to an agreement dated February 15, 1985, the Miller Brothers agreed to pay all the expenses related to the case, and the Blohms agreed to make themselves available to assist with the litigation. The Blohms also agreed to extend the primary term of the 1984 lease to six months beyond the completion of the suit.

The suit was settled in October 1986.[4] Stipulation and Order for Dismissal, *Blohm v. Amoco Prod. Co.*, No. 84-2542 (Cir. Ct. Oceana County Oct. 23, 1986). Although the precise terms of the settlement are not disclosed in the stipulation for dismissal, Amoco conveyed all of its leasehold interests in the Blohms' property, the Foxes' property, and several nearby properties to the Miller Brothers in a quit claim deed dated October 7, 1986. The deed was conveyed "in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration paid by Miller Brothers[.]" Pursuant to the 1986 deed, the Miller Brothers owned the Miller-Fox 1-11 well, and a leasehold or fee interest in all the minerals underlying both the Blohm and Fox properties. At the time the suit was terminated, the Blohms mineral interests were potentially subject to two leases: the 1984 lease to the Miller Brothers and the 1981 lease to Amoco. Although it is not clear from the record if it was ever determined which lease was effective, the 1986 quit claim deed meant that the Miller Brothers controlled both leases, and consequently the rights to the minerals underlying the Blohms' farm, regardless of which was effective. Importantly, by October of 1986, the Miller Brothers no longer had an economic incentive to reverse the Supervisor's pooling decision and drill a well on the Blohms' southernmost eighty-acres because a new well would only compete with the existing well on the pooled tract of land, and the Miller Brothers controlled all the rights to that well.

During the next fifteen years, the Miller Brothers and their successors entered into several agreements with the Blohms, but a successful well was never drilled on the property. Among those

---

[4]Joyce Blohm asserts in her affidavit that the Miller Brothers informed the Blohms that they "lost the case." Blohm Aff. ¶ 17. Although there may have been a decision adverse to the Blohms' interest at some point, it is not part of the record in this case.

agreements was a 1987 lease, which in effect renewed the 1981 and 1984 leases.[5] Also in 1987, the

Miller Brothers, the Foxes, and the Blohms entered into a "Declaration of Pooling" ("1987 pooling

agreement"), which is a contractual agreement dividing the gas produced by the Miller-Fox 1-11 well

based on the mineral rights controlled by each party in the drilling unit. The 1987 pooling agreement

listed the names of the Foxes, Blohms, and Miller Brothers' investors in its heading, and provided:

> WHEREAS, the above are the Owners of the following described Oil and Gas Leases:
>
> 1. [lease to John T. Stoliker covering the Foxes' eighty-acre parcel]
>
> 2. Oil and Gas Lease Date March 9, 1984, recorded in Liber 841, Page 151, from Homer E. and Joyce G. Blohm, Lessors to Miller Brothers Oil Corporation, Lessee, covering N/2 of SW/4, S/2 of NW/4; and NE/4 of NW/4, Section 11, T13N, R18W, Oceana County,
>
> or own a mineral interest in the following lands:
>
> > Southwest Quarter (SW 1/4), Section 11, T13N-R18W, Oceana County, Michigan[.]
>
> . . .

---

[5]The 1984 lease was terminated by agreement of the parties before the 1987 lease was completed, potentially creating a gap between the 1984 lease and the 1987 lease. However, the Miller Brothers had also purchased the 1981 lease from Amoco, which was potentially still valid until the 1987 lease was agreed upon. The 1981 and 1984 leases covered the Blohms' entire 200-acre farm. The 1987 lease covered just the southernmost eighty acres that were part of the Miller-Fox 1-11 drilling unit.

NOW THEREFORE, The Parties hereto agree as follows:

1.　　All interest of the parties hereto in the [oil and gas] underlying [the Miller-Fox 1-11 drilling unit] are hereby pooled, consolidated and unitized into a single pooled unit for the operation for and the development and production of the [oil and gas from the drilling unit].

2.　　Any well drilled on any part of the [drilling unit] for the discovery and production of [oil and gas], whether now drilling or heretofore or hereafter drilled, and all operations with respect to any such well, shall be considered for all purposes, except the payment of royalty, to be a well drilled and operations conducted under the terms of each of the leases described above.

1987 Pooling Agreement at 1–2. The agreement was signed by the Blohms, Foxes, and various parties representing the Miller Brothers, but it is not clear from the record exactly when the agreement was completed, nor if it was ever recorded. *Id.*

A later document, titled "Amendment to Declaration of Pooling," was recorded by the Oceana County Register of Deeds on May 24, 1989 ("1989 Amendment"). The 1989 Amendment is also signed by the Blohms and a representative of Conoco, Inc., the successor to the Miller Brothers' interests in the Miller-Fox 1-11 drilling unit. The 1989 Amendment shows that Conoco had acquired mineral lease interests in the Foxes' eighty-acre parcel and the Blohms' remaining half-interest in their eighty-acre parcel, as well as the title to the half-interest the Blohms had deeded to Miller Brothers in 1983. The 1989 Amendment also purports to substitute the 1987 lease for the 1984 lease in the 1987 pooling agreement, and to specifically add Conoco's fee interest, arising from the 1983 deed, to the pooling agreement. It provides that "it is deemed necessary and advisable, and

is the desire of Conoco and the Parties to amend the Declaration of Pooling to pool and combine said Leases and the fee mineral interest to form a unit for the proper development and operations of the same for the production of oil and/or gas[.]"

Although the 1987 Pooling agreement provides that any well located on the drilling unit, including the Miller-Fox 1-11 well, shall satisfy drilling and production requirements in the various "leases," it does not specifically state that the Miller-Fox 1-11 shall satisfy the drilling requirement in the 1983 deed. Similarly, the 1989 amendment specifically incorporates the deeded interest into the pool, but it does not provide that the Miller-Fox 1-11 satisfies the drilling requirement in the deed.

Sometime in 2002, the pipeline to Manistee was completed and the Miller-Fox 1-11 began operating. *See* Blohm Aff. ¶ 18. The Blohms received their first royalty checks from their one-quarter interest in the Miller-Fox 1-11 drilling unit that year. *Id.* In the summer of 2002, Plaintiff Omimex Energy acquired the Miller-Fox 1-11 well, and also acquired the 1983 deed. Omimex, like their predecessors in interest, the Miller Brothers and Conoco, also had no incentive to drill on the Blohms farm because it held a leasehold interest in the minerals underlying both farms. Drilling a second well would be an unnecessary expense because it would simply compete with an operating well Omimex owned.

In 2002, near the time period when Omimex acquired its interests in the Blohm and Fox properties and the operational Miller-Fox 1-11 well, it obtained a title opinion from Loomis, Ewert,

Parsley, Davis & Gotting, concerning the deeded half interest originally conveyed by the Blohms to the Miller Brothers in 1983. The title opinion urged Omimex to "confirm that the term mineral interest was intended to be held by production from a well on lands other than lands covered by the deed . . . . In this regard it is essential that you record a proper of [sic] Pooling Declaration for the Miller-Fox # 1-11 Well prior to April 16, 2003." Loomis Title Op., Oct. 10, 2002. Several similar title opinions had been issued to Omimex and its predecessors in the years between the 1987 pooling agreement and the expiration of the twenty-year term. *See, e.g.*, Loomis Title Op., Dec. 26, 2001. Omimex did not act on the recommendation of the title opinion, nor had any of its predecessors acted on similar recommendations. A new declaration of pooling making clear that the drilling clause in the 1983 deed was satisfied by the now-operational Miller-Fox 1-11 was never recorded.

April 16, 2003 marked the 20-year anniversary of the 1983 deed, and the Blohms asserted that the deeded one-half mineral interest in their farm had reverted back to them. Blohm Aff. ¶ 20. Omimex, however, disagreed, and negotiations commenced concerning termination of the deed. *Id.* ¶ 22.

On May 1, 2006 Omimex filed this suit, seeking a declaration of the parties' respective interests in regard to the 1983 deed, and a declaration "(i) that the Mineral Deed has been extended as a result of certain events; and (ii) that Plaintiffs are the owners of the 100/200 oil and gas interest in the property." Op. & Order, Nov. 15, 2007. In November 2007, the Honorable Gordon J. Quist, U.S. District Judge for the Western District of Michigan, granted summary judgment in favor of Joyce Blohm, concluding that Omimex had not presented sufficient evidence to raise a genuine issue

of fact as to whether the 1983 deed had been modified by subsequent agreements such that it did not revert to the Blohms in 2003 due to the lack of a producing well on the Blohms' property. Omimex filed a timely notice of appeal.

## II

Omimex raises two arguments on appeal. First, it contends that the 1987 pooling agreement and 1989 amendment actually modified the 1983 deed, and that the documents, taken together, show the parties' intention to override the condition to the extent that it required a well drilled "during" the twenty-year term. Second, it contends that the district court's reconsideration of its initial opinion violates the law of the case doctrine.

## A

The district court's decision to grant Blohm's motion for summary judgment is reviewed de novo. *Bukowski v. City of Akron*, 326 F.3d 702, 707 (6th Cir. 2003). Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). When making the determination, all facts and inferences drawn from the evidence in the record must be viewed in the light most favorable to the nonmovant. *Bukowski*, 326 F.3d at 707 (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 500 (6th Cir. 2002)).

Under Michigan law, an unambiguous deed or contract is interpreted according to the plain meaning of its language. *Taylor v. Taylor*, 17 N.W.2d 745, 746 (Mich. 1945). Interpretation of an unambiguous deed is a question of law. *Port Huron Educ. Ass'n, MEA/NEA v. Port Huron Area Sch. Dist.*, 550 N.W.2d 228, 237 (Mich. 1996). "If, however, there is an ambiguity, or if the deed[] fail[s] to express the obvious intention of the parties . . . the courts will consider the situation, acts, conduct[,] and dealings of the parties" in an effort to arrive at their intentions. *Farabaugh v. Rhode*, 9 N.W.2d 562, 565 (Mich. 1943). Still, the focus remains at all times on arriving at the intent of the parties as expressed by the plain language of the whole instrument, and the "only purpose of the rules of construction of conveyances is to enable the court to reach the probable intent of the parties when it is not otherwise ascertainable." *See Mich. Dep't of Natural Res. v. Carmody-Lahti Real Estate, Inc.*, 699 N.W.2d 272, 279 (Mich. 2005) (quoting *Purlo Corp. v. 3925 Woodward Ave., Inc.*, 67 N.W.2d 684, 686–87 (Mich. 1954) (citations omitted)). "[N]o language in the instrument may be needlessly rejected as meaningless, but, if possible, all the language of a deed must be harmonized and construed so as to make all of it meaningful . . . ." *Id.*

Although Michigan courts have recognized that oil and gas leases, and by implication other oil and gas contracts, are "technical contract[s]" to be read in accordance with the "purpose of [their] clauses," they will not ignore the plain language of the contract terms. *Mich. Wis. Pipeline Co. v. Mich. Nat'l Bank*, 324 N.W.2d 541, 544 (Mich. Ct. App. 1982) (quoting *J.J. Fagan & Co. v. Burns*, 226 N.W. 653, 654 (Mich. 1929)). Accordingly, in construing a requirement that the lessee "produce[]" oil or gas from the leased land in order to extend a lease term, the Michigan Court of

Appeals held that production in paying quantities to the lessee is not required, but nor would "any" production suffice. *Id.* at 544–45. Rather, the production level required to extend the lease was the level an operator acting in a "reasonable and prudent manner" would ordinarily produce in like circumstances. *Id.* at 545–46.

Here, the 1983 deed is unambiguous; the intentions of its signors are clear from the face of the document. The deed required that at least one well capable of producing oil or gas be drilled on the Blohms' farm or a parcel properly pooled with the Blohms' farm during the twenty year term or the deeded interest would revert to the grantors. No well was drilled during the twenty-year term. Accordingly, the deeded interest reverted to the Blohms in 2003 unless the condition was modified by a later agreement between the parties.

This conclusion is supported both by the plain language of the deed and the circumstances surrounding its execution. The timing of the conveyance makes clear that when the deed was executed both parties believed a second well—a well drilled during the twenty-year term—was required to extend the lease. The deed was conveyed shortly before the Miller-Fox 1-11 drilling unit hearing in order to advance the mutual interest of the grantor and grantee in opposing the expanded drilling unit. Indeed, both the Miller Brothers and the Blohms continued to oppose the expanded drilling unit until October 1986. Before that time, both parties sought an opportunity to drill a well on the Blohms property. After that time, the Miller Brothers held a controlling interest in the Miller-Fox 1-11 and the incentive to drill a second well evaporated.

Omimex contends that the 1987 pooling agreement and the 1989 amendment to the pooling agreement demonstrate the parties' intent to modify the agreement. A party asserting that a condition in a deed has been modified bears the burden of proving mutual assent to modification by clear and convincing evidence. *See Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 257–58 (Mich. 2003).

The 1987 pooling agreement and the 1989 amendment clearly pool the various fee interests and lease interests—including the 1983 mineral deed—in the 160-acre drilling unit, and divide the proceeds from the gas produced proportionately to the acreage controlled by each party. The 1987 agreement also provides that a well drilled or producing anywhere in the 160-acre unit "shall be considered for all purposes . . . a well drilled and operations conducted under the terms of each of the leases . . . ." 1987 agreement ¶ 2. Accordingly, the Miller-Fox 1-11 well satisfied, "for all purposes," any drilling requirements in each of the pooled leases. However, neither the 1987 agreement nor the 1989 amendment provide that the Miller-Fox 1-11 satisfies drilling conditions in the pooled fee interests or that the parties intended to waive the requirement in the 1983 deed that a well be drilled "during" the twenty-year term.

While Plaintiffs' argument concerning modification of the deed has some force, it is ultimately unpersuasive because of its exclusive reliance on a single provision in the 1987 agreement. That provision alone cannot provide clear and unambiguous proof that the parties mutually agreed to modify the condition. The Plaintiffs have not produced a single document that explicitly memorializes the Blohms intent or belief that the Miller-Fox 1-11 well would satisfy the

drilling requirement in the 1983 deed. Nor have they produced an affidavit from one of the signatories to the pooling agreements or 1989 amendment, explaining that the parties to the agreements understood that the Miller-Fox 1-11 would satisfy the drilling requirement. Indeed, Omimex obtained a title opinion in 2002, which emphasized the ambiguity concerning whether the Miller-Fox 1-11 well satisfied the drilling requirement, and recommended an explicit modification to the 1983 deed. Omimex did not act on the recommendation.

Moreover, when the deed was negotiated in 1983, the Miller-Fox 1-11 had already been completed and was ready for operation, pending extension of the sour gas pipeline. It is clear from the language of the deed, as well as the surrounding circumstances, that both parties believed at least one operational well would need to be drilled on the Blohms' property in order to satisfy the deed's condition. Such a well was never drilled. Although settlement of the 1984 lawsuit and conveyance of the 1986 quit claim deed from Amoco to the Miller Brothers dissolved the Miller Brothers' economic incentive to drill a well on the Blohms property, it did not alter the Blohms' circumstances. The record does not demonstrate that the Blohms voluntarily released the Miller Brothers from their obligation to drill a well on the Blohms' property, despite the fact that the Miller Brothers and their successors had nearly seventeen years to negotiate such a release.

Omimex has relied exclusively on a pair of ambiguous documents to support its contention that the deed was modified. By contrast, Blohm has produced a clearly worded, unambiguous deed and established that the original grantor and grantee intended for it to be enforced as written. Because no well was drilled on the Blohms' farm during the twenty-year term, the condition in the

deed was not satisfied. Accordingly, the deeded mineral interest reverted to the grantors, the Blohms, on April 16, 2003.

## B

Omimex next contends that the district court violated the law of the case doctrine when it changed course and granted Blohm's motion for summary judgment in 2007, notwithstanding a 2006 decision to the contrary. A district court's application of the law of the case doctrine to that court's own rulings is reviewed for abuse of discretion because it is a "discretionary tool" meant to promote judicial efficiency and not a limit on the court's power. *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990). Pursuant to the doctrine, "a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation." *Id.* (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). A district court may disregard its own earlier decision only under "extraordinary conditions" where some "cogent reason" makes that decision inapplicable, such as if the prior decision was "clearly erroneous," based on substantially different evidence, or was followed by a contrary decision from a controlling authority. *In re Kenneth Allen Knight Trust*, 303 F.3d 671, 677–78 (6th Cir. 2002) (citations and quotation marks omitted); *see also In re U.S. Steel Corp.*, 479 F.2d 489, 494 (6th Cir. 1973). Still, the doctrine is not an "inexorable command," and the decision to disregard an earlier ruling is left to the court's "good sense." *In re U.S. Steel Corp.*, 479 F.2d at 494.

The district court recognized that its decision to grant Blohm's summary judgment motion in 2007 was contrary to its earlier decision to deny Blohm's motions to dismiss and for summary judgment. *Compare* Op. & Order, Sept. 19, 2006, *with* Op. & Order, Nov. 15, 2007. The court noted, however, that its first ruling was issued without the benefit of discovery, and that its understanding of the case had changed as the evidence was better developed. At the earlier stage, Omimex had presented sufficient evidence to defeat Blohm's motions. After discovery, however, the court reassessed whether the evidence presented justified a trial and concluded to the contrary.

The district court's decision was not an abuse of discretion. Nothing prevented the trial court from reassessing the evidence, following discovery and additional briefing from the parties, and concluding that the evidence provided to support Omimex's position did not warrant a trial. Particularly where the parties had presented complex arguments based on differing interpretations of a series of documents, it was not unreasonable for the trial judge's understanding to change. The trial judge recognized that the law of the case doctrine was available as a "discretionary tool" that could be employed to avoid revisiting the issue, but decided instead that "extraordinary circumstances" merited reconsideration in this circumstance. *See Todd*, 920 F.2d at 403.

**III**

The district court's judgment that the mineral interest conveyed by the 1983 deed reverted to the Blohms on April 16, 2003 is **AFFIRMED**.