*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0472p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FRANCES F. ARLEDGE and JAY K. MITCHELL,
Co-Administrators of the Estate of Daniel Arledge
Mitchell, Deceased,

> *Plaintiffs-Appellants*,

> No. 06-4360

*v.*

FRANKLIN COUNTY, OHIO; FRANKLIN COUNTY
CHILDREN SERVICES; SARAH TORNCHIO; JESSE
LOOSER; JOHN SAROS; DANA COLON,

> *Defendants-Appellees*,

STEPHEN P. POWERS,

> *Defendant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-00078—Michael H. Watson, District Judge.

Argued: November 28, 2007

Decided and Filed: December 11, 2007

Before: MARTIN, SILER, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Karl H. Schneider, MAGUIRE & SCHNEIDER, Columbus, Ohio, for Appellants. Nick A. Soulas, Jr., PROSECUTING ATTORNEY'S OFFICE, Columbus, Ohio, for Appellees. **ON BRIEF:** Bradley D. Barbin, MAGUIRE & SCHNEIDER, Columbus, Ohio, for Appellants. Mary J. Martin, Arnold Paul Thies, PROSECUTING ATTORNEY'S OFFICE, Columbus, Ohio, for Appellees.

---

## OPINION

---

BOYCE F. MARTIN, JR., Circuit Judge. Plaintiffs Frances Arledge and Jay Mitchell brought suit alleging due process violations under the state custody theory, the state-created-danger theory, and the unconstitutional policy or custom theory, stemming from defendants' placement of their son in a non-foster home where he was subsequently shot and killed. The district court granted

1

summary judgment in favor of defendants, finding that plaintiffs failed to show the requisite culpability to maintain a claim under any of the alleged theories of liability. We hold that plaintiffs have not shown the requisite culpability, and AFFIRM the district court's ruling.

I.

Plaintiffs Frances Arledge (mother) and Jay Mitchell (father) were the parents of Daniel Mitchell. In 1998, Arledge and Mitchell separated, and Arledge voluntarily agreed to let Mitchell retain custody of Daniel. However, at some point in 2000, Daniel began living with Arledge, and did so up until October 21, 2002.

Arledge and Daniel resided in a trailer home in Pickaway County, Ohio. Steve and Lena Powers lived in the same trailer park as Arledge, and Daniel worked for Mr. Powers performing tree cutting work. Daniel would often stay overnight at the Powers' trailer. While living with Arledge, Daniel began getting in trouble, and was eventually placed on probation by the juvenile court. He was 14 at the time. Susan Wears was assigned as his probation officer. Daniel was placed on house arrest when Arledge discovered drugs in the home and reported it to Daniel's probation officer.

In October 2002, Daniel was placed in the juvenile detention center in Pickaway County for alleged probation violations. On October 21, 2002, a hearing was held concerning Daniel's repeated probation violations and Arledge's inability to control him. At the hearing, Arledge testified that she could no longer control Daniel and it would be better if he returned to his father in Franklin County. Daniel's probation officer, Susan Wears, told Mitchell, Daniel's father, that she preferred that Daniel move in with him. After the hearing, Daniel was transferred directly from detention to his father's custody in Franklin County.

On October 23, 2002, Mitchell prepared to take Daniel to register for classes at Grove City High School. Mitchell asked Daniel to remove his lip piercing, and Daniel refused. Mitchell then attempted to remove it himself. When this proved unsuccessful, Mitchell called Franklin County Children Services (FCCS) to ask for advice. FCCS advised Mitchell to call the Grove City Police Department, which Mitchell did. Before the police arrived, Mitchell grabbed Daniel, placed him on the ground, and sat on him. When the police arrived, they arrested Mitchell on charges of domestic violence.

After arresting Mitchell, the police transported Daniel to the FCCS intake center for placement. During his intake interview, FCCS learned that the Mitchell family had a criminal history in Franklin County. FCCS also learned that Daniel wanted to live either with his mother or Stephen and Lena Powers, both of whom resided in Pickaway County. Daniel was transferred to the FCCS investigative unit for an interview with caseworkers. Daniel's mother, Arledge, was not contacted.

In the investigative unit, Daniel's case was assigned to caseworkers Sarah Tornichio and Jesse Looser. Because this was Tornichio's first referral, Looser acted as her mentor. Tornichio and Looser interviewed Daniel on October 23, 2002. When asked whom he could live with, Daniel provided the Powers' name. Looser then contacted Stephen Powers to determine if he would allow Daniel to stay in his home. Powers stated he would allow Daniel to stay with him and gave Looser directions to his home in Pickaway County. Looser then called Pickaway County Children's Services (PCCS) to determine if the Powers had any history with the agency, either as abuse perpetrators or as foster parents. Looser was informed by PCCS that the Powers had no history with them, but that Daniel's probation officer in Pickaway County, Wears, wished to speak with Looser about Daniel's placement.

On October 23, Looser spoke with Wears (Daniel's probation officer), who voiced her concern about placing Daniel with the Powers. She told Looser that the Powers were not relatives

of Daniel, and whenever Daniel had trouble with his parents, he went to the Powers' trailer. Wears was concerned Daniel was being placed back in the trailer park, an environment he had not "stabilized" in earlier. She was also concerned that the trailer park was drug-infested. Wears also testified that foster care or detention were preferable to any placement in the trailer park given the amount of drug activity in the area.

Despite Wears's concerns, FCCS decided to place Daniel with the Powers. On October 23, 2002, Looser and Tornichio transported Daniel to the Powers' trailer, and conducted an Initial Home Review before placing Daniel in the trailer. The Review was only partially completed, with the questions regarding whether any household members had criminal charges or convictions left blank. At the time of the Review, Mr. Powers was on probation for aggravated menacing stemming from an incident on September 17, 2002, in which Mr. Powers fired a shotgun over the head of a group of people outside his trailer. However, Powers failed to reveal this information to Looser or Tornichio. The Powers were advised they needed to come to the FCCS offices to get fingerprinted for a background check. Additionally, while the Initial Home Review protocol required that either Looser or Tornichio verify that any firearms present in the home be stored, inoperable, and locked, and that ammunition be stored separately, neither did so.

While at the Powers' trailer, Looser and Tornichio found that Daniel's sister, Patience, was also living there. They also noted that some of Daniel's belongings were already at the Powers' residence. Looser and Tornichio examined both Daniel's and his sister's bedrooms. Looser and Tornichio left Daniel at the Powers' trailer at approximately 6:00 p.m. on October 23, 2002.

The next day, Tornichio called the Powers to remind them to come into her office to get fingerprinted for their background checks. She did not speak to Daniel.

That same evening, October 24, 2002, at approximately 10:45 p.m., Mr. Powers pointed a loaded .357 Magnum handgun at Daniel's head and asked, "Loaded or unloaded?" Powers then pulled the trigger and shot Daniel in the forehead. Daniel died approximately an hour later as a result of his gunshot wound. Mr. Powers was sentenced to ten years in prison for manslaughter, and later committed suicide while in custody.

Daniel's parents, Arledge and Mitchell, brought suit against FCCS, Franklin County, Looser, Tornichio, John Saros (Executive Director of FCCS), Dana Colon (FCCS Supervisor), and Stephen Powers, alleging violation of 42 U.S.C. § 1983. On September 29, 2006, the district court granted summary judgment to the defendants on all of plaintiffs' claims.

II.

The district court granted summary judgment to defendants based on its decision that plaintiffs could not establish the requisite degree of culpability on the part of defendants in order to maintain a claim for state custody or state-created-danger under § 1983. The district court "express[ed] no opinion as to whether defendants established a 'special relationship' with Daniel or whether defendants affirmative acts created or increased the risk of exposing Daniel to private acts of violence." *Arledge v. Franklin County Children's Servs. Bd.*, 2006 U.S. Dist. LEXIS 73394, at *17 (S.D. Ohio 2006).

We review the district court's grant of summary judgment de novo, and "must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting FED. R. CIV. P. 56(c)) (internal quotation marks

omitted).  "Weighing of the evidence or making credibility determinations are prohibited at summary judgment – rather, all facts must be viewed in the light most favorable to the non-moving party."  *Id.*

1.      *Liability Under § 1983 for Acts of Third Parties*

"[T]o survive summary judgment in a § 1983 action, [plaintiffs] must demonstrate a genuine issue of material fact as to the following two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law."  *McQueen v. Beecher Comm. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006) (internal quotation marks omitted).  While a § 1983 action typically requires a state actor, there is an exception in cases of state custody.  *See Deshaney v. Winnebago Cnty. Dept. of Soc. Serv.*, 489 U.S. 189 199-201 (1989).  In addition, a state-created-danger theory allows a plaintiff to hold the government liable for acts done by a third party.  In *Kallstrom v. City of Columbus*, this Court recognized the state custody and the state-created-danger theories of due process liability and laid out three requirements for establishing such claims: (1) an affirmative act that creates or increases the risk, (2) a special danger to the victim as distinguished from the public at large, or a special relationship between the state and either the victim or the private actor, and (3) the requisite degree of state culpability.  136 F.3d 1055, 1066-67 (6th Cir. 1998).

2.      *Requisite Culpability*

Here, the district court held that plaintiffs had not failed to establish the requisite culpability on the part of defendants.  In *McQueen*, this Court recognized that in instances where there is opportunity for "reflection and unhurried judgments," a plaintiff must show that the state acted with deliberate indifference.  *McQueen*, 433 F.3d at 469 (quoting *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003)).  In order to show deliberate indifference, the state actor "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.*  However, circumstantial evidence may be used to show that "the risk was so obvious that the official had to have known about it."  *Id.* (quoting *Bukowski*, 326 F.3d at 710).  In the present case, the district court held that "[p]laintiffs fail[ed] to present any evidence, direct or circumstantial, which would establish defendants were aware of facts regarding Mr. Powers from which the inference could be drawn that a substantial risk of serious harm to Daniel existed and that defendants drew the inference."  *Arledge*, 2006 U.S. Dist. LEXIS 73394, at *24.

On appeal, plaintiffs argue that when the record is considered as a whole, there is a genuine issue of material fact as to whether the defendants acted with deliberate indifference.  The plaintiffs argue they have shown evidence of the following: (1) the defendants were aware that Stephen Powers owned a gun; (2) the defendants did not inspect the gun; (3) Wears warned defendants that the trailer park was drug-infested; (4) defendants were aware that Daniel had a drug problem; (5) Wears stated she did not want Daniel placed with Powers and that a juvenile magistrate judge would support her recommendation; (6) Wears warned the defendants that "kids" go to the Powers's trailer often; and (7) after Daniel was placed in the Powers' trailer, Wears warned defendants that she had drug abuse concerns about the Powers' trailer.

Even assuming the facts above to be true, no evidence suggests that defendants actually drew the inference that Daniel was subject to a substantial risk of serious harm.  Thus, the question is whether these facts are sufficient to show that "the risk was so obvious that the [defendants] had to have known about it."  *McQueen*, 433 F.3d at 469.  The district court did not think so, finding that "defendants cannot show that the risk of such a violent act by Mr. Powers was so obvious that defendants had to have known about it."

In hindsight, it appears the defendants were aware of many facts that would cause a reasonable person to pause before placing a juvenile in the Powers' custody. However, when we look at the totality of the circumstances, which the plaintiffs advocate, it does not appear that plaintiffs can show the requisite culpability on the part of defendants. Tornichio's and Looser's depositions make clear they inspected the Powers' trailer and found it to be a relatively happy place that was familiar to Daniel because his sister lived there and he had obviously stayed there in the past. Daniel made it clear to Tornichio and Looser that he would not run away from the Powers' trailer. As defendants concede, more investigation could have been done regarding Daniel's placement with the Powers, but given the facts known to them, or so obvious they should have known of them, it is not clear that defendants could have drawn, or obviously must have drawn, an inference that a substantial risk of serious harm existed. Accordingly, we affirm the district court's ruling that plaintiffs failed to establish the requisite culpability to maintain their action.

Having agreed with the district court's finding that the requisite culpability cannot be shown, it is not necessary for us to discuss the other elements of plaintiffs' state custody and state-created danger claims.

*3.        Requisite Culpability Under The Unconstitutional Policy or Practice Theory*

Plaintiffs have also brought a claim against Franklin County under § 1983 for an unconstitutional policy or practice. For liability to attach, plaintiffs must show a wrongful or injurious policy or custom on the part of the County and a causal link between the policy and the unconstitutional deprivation. *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994) ("a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants [and] such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983."). Plaintiffs claim that Franklin County inadequately trained its caseworkers such that they were not required to contact law enforcement agencies in the county of placement to insure that prospective care givers did not have criminal backgrounds. This failure resulted in Daniel's placement with Mr. Powers despite Mr. Powers's conviction for aggravated menacing, which would have precluded his eligibility as a possible residence for Daniel.

As the district court held, in order to meet the deliberate indifference standard outlined in *Berry* and *City of Canton v. Harris*, the failure to train must reflect a deliberate or conscious choice made by the municipality. 489 U.S. 378, 388-89 (1989). The County may be held liable only if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

We agree with the district court that plaintiffs have not established deliberate indifference; rather, the plaintiffs have shown only negligence. As discussed earlier, it is obvious that more could have been done, and that better training and procedures may have helped to prevent Daniel's death. But it cannot be said that the inadequacy of the training provided by the county was so obviously inadequate as to likely result in a violation of constitutional rights. There was no history of this type of violence in Franklin County; only Daniel's tragic incident is presented as evidence of the alleged unconstitutional policy and practice. Accordingly, it cannot be said that Franklin County was deliberately indifferent to the need for more or different training in this context.

III.

Plaintiffs have failed to show the requisite deliberate indifference by defendants in order to maintain their § 1983 claims. Accordingly, we AFFIRM the district court's grant of summary judgment.