NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0529n.06

Case No. 25-3247

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| R.S., a minor child by his next of friend and legal guardian, V.H.; T.H., | ) ) ) | **FILED** Nov 18, 2025 KELLY L. STEPHENS, Clerk |
| Plaintiffs - Appellants, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| LUCAS COUNTY CHILDREN SERVICES, | ) ) | |
| Defendant, | ) ) | |
| SUSAN HICKEY; REBECCA VON SACKEN, | ) ) | OPINION |
| Defendants - Appellees. | ) ) ) | |

Before: GIBBONS, McKEAGUE, and RITZ, Circuit Judges.

**RITZ, Circuit Judge.** Victoria Hubbard's minor children were removed from her custody and placed with the family of her trusted pastor and his wife, because children's services case workers in Lucas County, Ohio, suspected abuse of Hubbard's youngest child. At the time, the background information the case workers had on file for the pastor and his wife associated the couple's household with alleged sexual abuse. The alleged abuse, however, either had not been substantiated or had been perpetrated by someone besides the couple. Ultimately, Hubbard's children did suffer terrible abuse, including sexual abuse, while in the couple's custody. In fact, the pastor eventually went to prison for sexually exploiting another minor child living in the household.

Plaintiffs R.S. and T.H., two of Hubbard's children, sued various Lucas County children's services employees, alleging a deprivation of the plaintiffs' substantive due process rights.

The defendants moved for summary judgment, arguing that the plaintiffs could not show that the defendants acted with deliberate indifference. The plaintiffs moved to strike several affidavits that the defendants relied on in their summary judgment motion and asked for more time to conduct discovery. The district court granted the defendants' summary judgment motion and denied the plaintiffs' procedural motions in a single order. The plaintiffs now appeal that order as to defendants Rebecca Von Sacken and Susan Hickey. For the reasons below, we affirm.

## BACKGROUND

### I. Factual background

#### A. LCCS's response to suspected abuse of Hubbard's children

In July 2014, Victoria Hubbard's infant presented at a hospital emergency room with several broken rib bones and failure to thrive (that is, the baby was not gaining enough weight). The hospital contacted Lucas County Children Services (LCCS) to report suspected child abuse, and LCCS caseworker Ryan Parker went to the hospital to investigate. Parker met with Hubbard and her son, R.S., about her baby's injuries. After speaking with Hubbard, Parker discussed the investigation with his LCCS supervisor, who instructed Parker to have Hubbard's two other young children brought to the hospital so that LCCS could create a safety plan for them.

Parker discussed potential safety plans with Hubbard, who told Parker that the children could be placed with her pastor, Anthony Haynes, and his wife, Alisa,[1] at their home. At Hubbard's instruction, Alisa brought two of Hubbard's other children to the hospital. Parker informed his supervisor that the Haynes family "already had a case worker in the home," because they were working with LCCS to care for another child, and "had recently been fingerprinted."

---

[1] Alisa is sometimes referred to as "Lisa" in the record. We will refer to her as "Alisa" for consistency. And, for ease of reference, we will refer to Anthony Haynes and Alisa Haynes by their first names.

RE 109-2, Parker Aff., PageID 2087-88. The supervisor "instructed [Parker] to ensure criminal records checks were completed and to check the Statewide Automated Child Welfare Information System (SACWIS) to see if the family had any LCCS involvement." *Id.* at PageID 2088. SACWIS is a "statewide information system to keep and maintain case information on child welfare cases." RE 109-4, Cully Aff., PageID 2093. Parker performed these checks and found no records demonstrating that either Anthony or Alisa had been "a substantiated perpetrator of abuse or neglect" or had a "disqualifying [criminal] history." RE 109-2, Parker Aff., PageID 2088. Records also revealed that a case worker had been in their home within the last month, and a check on the Hayneses' 19-year-old son returned "no results." *Id.* Parker entered all of his case notes into SACWIS and transferred the case to LCCS's "assessment[] department." *Id.*

The next day, LCCS case worker Rebecca Von Sacken received the case. She worked with the plaintiffs and the Hayneses for approximately three weeks in July 2014. Von Sacken reviewed a "home study" that another LCCS case worker had completed and did her own "preliminary home study." RE 106-1, Von Sacken Dep., PageID 1836-37. Von Sacken's preliminary home study involved seeing the placement home and gathering information about the people who lived in it, as well as checking sources such as criminal records, sex offender registries, and SACWIS records. Von Sacken testified that "certain things," such as particular criminal convictions or items documented in the SACWIS history, would exclude a person from consideration for child placement. *Id.* at PageID 1843. Excludable criminal convictions included things such as certain drug offenses, murder, and domestic violence. As part of their review of SACWIS records, LCCS personnel would review any allegations in the system, the individual's role in the allegations, and the disposition of the allegations, on a case-by-case basis.

The Hayneses' home study document noted the following "referrals"—concerns reported to LCCS—that mentioned either Alisa or Anthony:

- 5/1999 Alisa was listed as the caretaker on an Indicated[2] Sexual Abuse referral.

- 5/2000 Alisa was listed as the caretaker on a Substantiated[3] Sexual Abuse referral.

- 10/2000 Alisa was listed as OIC[4] on an Unsubstantiated[5] Neglect referral.

- 10/2003 Alisa was listed as the caretaker on a Substantiated Sexual Abuse referral.

- 4/2004 Anthony was listed as the AP [alleged perpetrator] and Alisa was listed as the caretaker on an Unsubstantiated Sexual abuse referral.

RE 109-9, Home Study for Placement of Child(ren), PageID 2279. The home study document also noted that the Hayneses did "not have history of victimization of other children. Anthony was named AP in one referral which was not substantiated." *Id.* at PageID 2280.

Von Sacken told her supervisor about the SACWIS referrals, which Von Sacken understood as showing

> some referrals with . . . our agency that were either they were not listed as alleged perpetrator, if they were substantiated, or if . . . they had anything . . . where they were listed as alleged perpetrators . . . that were substantiated . . . . So there were

---

[2] An "indicated" report is one "in which there is circumstantial or other isolated indicators of child abuse or neglect lacking confirmation; or a determination by the caseworker that the child may have been abused or neglected based upon completion of an assessment/investigation." Ohio Admin. Code 5180:2-1-01(B)(161) (2025); *accord Fondale v. Guernsey Cnty. Child. Servs.*, 978 N.E.2d 918, 922 (Ohio Ct. App. 2012).

[3] A "substantiated" report is one "in which there is an admission of child abuse or neglect by the person(s) responsible; an adjudication of child abuse or neglect; or other forms of confirmation deemed valid by the [public children services agency]." Ohio Admin. Code 5180:2-1-01(B)(316) (2025); *accord Kyser v. Summit Cnty. Child. Servs.*, 243 N.E.3d 65, 68 (Ohio 2024).

[4] The parties do not define "OIC," but the term does not appear to be synonymous with "alleged perpetrator."

[5] An "unsubstantiated" report is one "in which the assessment/investigation determined no occurrence of child abuse or neglect." Ohio Admin. Code 5180:2-1-01(B)(344) (2025); *accord In re A.Z.*, No. 2022-CA-09, 2022 WL 16704963, at *13 (Ohio Ct. App. Nov. 4, 2022).

> no referrals in our system that said that they were [an] alleged perpetrator and it was substantiated.

RE 106-1, Von Sacken Dep., PageID 1850. Other than discussing this information with her supervisor, Von Sacken did not take further action with respect to the SACWIS records, including any further independent investigation: "We read . . . what was contained in the intake and then reviewed . . . the dispositional narrative . . . . Those investigations were completed by somebody else. . . . I did not investigate the Hayneses for abuse or neglect." *Id.* at PageID 1874.

LCCS's "Intake Information" records for Alisa, from which the home study document's "referrals" were drawn, did not show her to be an alleged perpetrator of a substantiated complaint of abuse. With respect to these "referrals," the intake information—consistent with the "referrals" listed in the home study document described above—noted: (1) in May 1999, Alisa was listed as a "caretaker" of a child on an intake for a report of sexual abuse by an adult who was not Anthony; the alleged perpetrator was Alisa's ex-husband (Marcus Fortune) and the victim was their daughter; this alleged abuse took place while Alisa and her ex-husband were in the process of getting a divorce; and the case was disposed of as an "indicated" claim; (2) in May 2000, Alisa was again listed as a "caretaker" of a child on another intake form for a report of a sexual abuse; once again, the alleged perpetrator was her ex-husband, not Anthony, and the victim was the daughter of Alisa and her ex-husband; and this claim was deemed to be "substantiated"; (3) in October 2000, Alisa was listed as an "exception" on an intake form for a claim of child neglect; Alisa's ex-husband was the alleged perpetrator and their two children were the alleged victims; and this claim was deemed to be "unsubstantiated"; and (4) in October 2003, Alisa was listed as a "caretaker" of two children on an intake for a report of sexual abuse where, again, Alisa's ex-husband was the alleged perpetrator and their children were the alleged victims; and this claim was deemed to be "substantiated." RE 109-11, Basic Intake Information for Lisa Haynes, PageID

2305-10, 2314.[6]  The agency's intake information records for Anthony equally did not show him to be an alleged perpetrator of a substantiated report of abuse: (5) in April 2004, Anthony was listed as an "alleged perpetrator" (and Alisa was listed as a "caretaker") on a report of sexual abuse; this claim was deemed to be "unsubstantiated."  RE 109-12, Basic Intake Information for Anthony Haynes, PageID 2318.

Other records available to LCCS personnel referenced Alisa's criminal history.  For example, a SACWIS record in LCCS's possession stated that as of April 2004, Alisa "[wa]s incarcerated."  RE 109-12, Basic Intake Information for Anthony Haynes, PageID 2318.  Another SACWIS record mentioned Alisa being arrested "for using stolen credit cards/identification."  RE 109-11, Basic Intake Information for Lisa Haynes, PageID 2307.  And the online docket for a Lucas County Common Pleas Case involving Alisa Haynes confirmed convictions for three fraud-related offenses that occurred in October 2000.

B.     Relocation to Hayneses' home

Because of the nature of Hubbard's infant's injuries, all seven of Hubbard's children who were living with her, including R.S. and her daughter T.H., were removed from her home, and the Hayneses were awarded temporary shelter care of the children.  Von Sacken then transferred the case to another LCCS employee, Department of Family Services case worker Susan Hickey.  Von Sacken and Hickey held a "transfer conference" to discuss the case and set up a case plan, and Hickey met with the children at the Hayneses' home just days after receiving the case.  RE 107-1, Hickey Dep., PageID 1946-48; 1960-61.  Hickey was given the preliminary home study, which

---

[6] Alisa had filed a protective order against her ex-husband, and the records indicate that she tried to limit interactions between her children and her ex-husband, but those efforts proved unsuccessful.

contained the SACWIS history for the Hayneses, and she completed the remainder of the home study.

Hickey's responsibilities included establishing a case plan for Hubbard's children, based on recommendations from the assessment case worker (here, Von Sacken), and monitoring the children until they could be seen by the local Juvenile Court, where permanent arrangements for their care would be made. Hickey did not "reinvestigate" the work already completed by Von Sacken, meaning she did not re-examine the Hayneses' background information or SACWIS records. RE 107-1, Hickey Dep., PageID 1953, 1962-63. From July 2014 until February 2015, when the Haynes family obtained legal custody of the children, including R.S. and T.H., Hickey visited monthly with the family and the plaintiffs.

### C. Allegations and incidents of abuse

After custody was awarded to the Hayneses, LCCS closed its case, but later addressed a referral made to it in April 2015 of sexual abuse involving plaintiff T.H. LCCS assessment case worker Kimberly Fraber received the referral, investigated it, and sent the information to the Toledo Police Department. But the police declined to investigate, and Fraber, after further interviews with the people associated with the referral, closed the case as "unsubstantiated." During Fraber's interviews, T.H. denied that anyone "had ever touched her in an unsafe way or a way that made her feel uncomfortable." RE 109-1, Fraber Aff., PageID 2085. T.H. also stated that she "felt safe" in the Hayneses' home and that "things were going well" there. *Id.*

Hubbard contends, and no defendant disputes, that she was never advised that the SACWIS records contained reports involving Anthony or Alisa. She also contends that no defendant advised her that Alisa had served time in prison for her various fraud convictions. Hubbard claims that,

had she known this information, she would not have consented to her children being placed with the Hayneses.

Sadly, and undisputedly, R.S. and T.H. were sexually and emotionally abused by the Hayneses while living in their home. All of the children were removed from the Hayneses' home—not because of referrals or suspicions of abuse, but after referrals to LCCS made in 2015 revealed that the children were living in substandard conditions. Neither R.S. nor T.H. disclosed the abuse that they experienced while living with the Haynes family until after they were removed from the home. Anthony and another pastor were later prosecuted federally for sex trafficking and sexual exploitation of a different child, T.T., who is not a plaintiff in the current case. *See United States v. Jenkins*, 821 F. App'x 504 (6th Cir. 2020). T.T. lived in the Haynes home with the plaintiffs and was identified as a person with knowledge of the allegations in their case.

## II.    Procedural history

In 2020, R.S. and T.H. filed this lawsuit, alleging constitutional and state-law violations, against LCCS; individual LCCS employees Von Sacken, Hickey, Courtney Mowery,[7] and Charmaine West[8]; and other Lucas County entities and employees. *See R.S. v. Lucas Cnty. Child. Servs.*, No. 22-3501, 2022 WL 17730531, at *2 (6th Cir. Dec. 16, 2022) ("*R.S. I*"). They also sued the Hayneses, their church, and several other individuals, churches, and businesses for state-law violations. *Id.* All of the Lucas County-related defendants moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), with the individual LCCS employees arguing that

---

[7] Plaintiffs alleged that Hubbard reported abuse to Mowery, who did not investigate the claim. *See R.S. v. Lucas Cnty. Child. Servs.*, No. 22-3501, 2022 WL 17730531, at *2 (6th Cir. Dec. 16, 2022) ("*R.S. I*").

[8] West discovered the children living in substandard conditions. *See R.S. I*, 2022 WL 17730531, at *2.

R.S. and T.H. had failed to state a plausible Fourteenth Amendment substantive due process claim and that the employees were entitled to qualified immunity. *Id.*

The district court agreed, but our court reversed the district court's Rule 12(c) order. In particular, we reversed the district court's determination on the Fourteenth Amendment substantive due process claim against Von Sacken, and, because the district court had not "conduct[ed] an individualized qualified immunity analysis for Hickey, Mowery, or West," remanded the case for "individualized analysis" as to those defendants. *Id.* at \*6.

Following remand, R.S. and T.H. filed an amended complaint in March 2023. As this appeal reaches us, they have one remaining claim, arising under 42 U.S.C. § 1983, against the LCCS employees for violation of their Fourteenth Amendment substantive due process rights. Defendants produced documents in September and October 2023 and deposed R.S., T.H., and Hubbard in November and December 2023. The plaintiffs did not serve their first set of discovery requests on the defendants until May 31, 2024, two weeks before the district court's June 14, 2024 discovery deadline.

After discovery closed, the defendants moved for summary judgment on the remaining substantive due process claim against West, Mowery, Von Sacken, and Hickey, arguing each was entitled to qualified immunity. The district court granted summary judgment for the defendants, finding that the plaintiffs had failed to establish a genuine issue of material fact as to whether the defendants violated the plaintiffs' constitutional rights. The court also denied two procedural motions that the plaintiffs had filed in connection with the summary judgment motion: (1) a motion to strike the affidavits of Fraber, Parker, and T.T., upon which the defendants had relied in moving for summary judgment; and (2) a motion to conduct additional discovery on the facts set forth in those affidavits. The plaintiffs filed this timely appeal as to defendants Von Sacken and Hickey.

**ANALYSIS**

We reject the plaintiffs' arguments and affirm. The district court properly ruled that R.S. and T.H. failed to set forth a genuine issue of material fact for trial on their § 1983 claim against Von Sacken and Hickey, because they could not show that these defendants acted with deliberate indifference in placing them with Anthony and Alisa Haynes. Also, the plaintiffs offer no developed argument to challenge the district court's rulings on their procedural motions, so they have forfeited those issues on appeal.

**I.    R.S. & T.H.'s § 1983 claim**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review de novo a district court's grant of summary judgment. *Ewolski v. City of Brunswick*, 287 F.3d 492, 500 (6th Cir. 2002).

In order to overcome the defendants' motion for summary judgment in this § 1983 action, R.S. and T.H. "must demonstrate a genuine issue of material fact as to the following two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006) (citation modified). Defendants claim that they are entitled to qualified immunity on this claim. Qualified immunity protects public officials from suit unless "(1) . . . the official violated a statutory or constitutional right, and (2) . . . the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation modified). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 741

(citation modified). A plaintiff ultimately bears the burden to show that the defendant public official is not entitled to qualified immunity. *Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019).

### A. State-created danger and the deliberate indifference test

A § 1983 action usually requires a state actor, but there is an exception under the "state-created-danger" theory, which allows a plaintiff to hold the government liable for acts done by a third party. *McQueen*, 433 F.3d at 463-64. Due-process liability under the state-created-danger theory exists where there is: (1) an affirmative act that creates or increases the risk; (2) a special danger to the victim as distinguished from the public at large, or a special relationship between the state and either the victim or the private actor; and (3) the requisite degree of state culpability. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065-67 (6th Cir. 1998). The district court here focused on the third prong of this test: whether Von Sacken or Hickey acted with the requisite degree of culpability. On appeal, the plaintiffs challenge only the district court's culpability analysis.

We analyze culpability in the state-created-danger context by asking whether the officials involved were deliberately indifferent. *See Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 933 (6th Cir. 2020). Where there is an "opportunity for reflection and unhurried judgments," a plaintiff must show that the state acted with deliberate indifference. *McQueen*, 433 F.3d at 469 (quoting *Bukowski v. City of Akron*, 326 F.3d 702, 710 (6th Cir. 2003)). The deliberate-indifference standard, which we have "equated . . . with subjective recklessness," consists of two parts. *Id.* First, the state actor must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw the inference." *Id.* Second, "[h]aving drawn the inference, the official . . . must act or fail to act in a manner demonstrating

reckless or callous indifference to the individual's rights." *Doe*, 954 F.3d at 933 (citation modified). Subjective recklessness can "be proven circumstantially by evidence showing that the risk was so obvious that the official had to have known about it." *Bukowski*, 326 F.3d at 710.

As to the first part, we have held that, to be aware of facts from which the inference of harm could be drawn, the "public official must know of more than a *general* risk of harm" and "must know of the *specific* risk that later develops." *Doe*, 954 F.3d at 933-34. For example, in *McQueen*, a first-grader brought a gun to school and fatally shot his classmate, Jane Doe. 433 F.3d at 462. Before the shooting, the child had attacked other students by beating them and stabbing them with a pencil. *Id.* On the day that he shot his classmate, the child's teacher left him alone in the classroom with other students, and, while left alone, the child killed Doe. *Id.* at 463. Doe's mother argued that the teacher acted with deliberate indifference by leaving the classroom because the teacher knew that the child "might violently assault another student." *Id.* at 469. We rejected that argument, not only because the plaintiff had failed to allege that the teacher knew or suspected that the child had a dangerous weapon with him on the day of the shooting, but also because the child's "history of behavioral problems" gave no indication that "he would escalate from hitting with fists, feet, and pencils" to a gun. *Id.* at 470.

We arrived at a similar result in *Doe*. There, a fifth-grader who was throwing lit matches from a rear school-bus window was told to sit at the front of the bus, where the driver could better supervise him, but where the fifth-grader ultimately sexually assaulted a kindergartener out of the driver's view. 954 F.3d at 928-30. We reasoned that the school employees might have known about the fifth-grader's "poor judgment, bullying tendencies, . . . dishonesty . . . [and] reckless match-lighting," but that this information did not tend to suggest the specific risk that he posed included "intentional sexual assault." *Id.* at 935.

Finally, in *Range v. Douglas*, 763 F.3d 573 (6th Cir. 2014), a county morgue attendant sexually abused the bodies of young women while drunk or high at work. *Id.* at 578. Evidence suggested that the morgue director might have known that the attendant was drinking, using drugs, and having sex with live women at the morgue. *Id.* at 579. We nonetheless reasoned that knowledge of this behavior would not necessarily have alerted officials of the specific risk of harm at issue—sexual abuse of corpses. *Id.* at 590-91.

As to the second part of the deliberate-indifference standard, we have held that, to act with reckless or callous indifference, a public official's response to the substantial risk of serious harm must also be "conscience shocking." *Doe*, 954 F.3d at 934 (quoting *Schroder v. City of Fort Thomas*, 412 F.3d 724, 731 (6th Cir. 2005)). And we have declined to find actions conscience shocking when officials simply acted with negligence. For example, in *Schroder*, a child was killed by a car speeding through a 25-mile-per-hour zone, which the child's parents had previously asked officials to lower to 15 miles per hour. 412 F.3d at 725. We held that the incident, although undeniably tragic, did not show "callous disregard"; rather, at most, the officials either "shortsightedly did not heed the complaints of its citizens" or "did not strike the correct balance in determining the proper speed limit" for the road where the child was killed. *Id.* at 731.

We reached a similar conclusion in *Ewolski*, where a police department's two-day armed standoff with a suspect ended with the suspect killing himself and his son. 287 F.3d at 496-500. In the subsequent § 1983 lawsuit challenging the officers' actions under the state-created-danger theory, we noted that the police chief had drawn the inference that the officers' tactics might provoke the suspect "to respond in a dangerous manner toward his wife and child" and had explicitly "considered the possibility of a murder-suicide." *Id.* at 513. Additionally, the plaintiffs had shown that the police chief "should have obtained more information from the mental health

professionals on the scene and may have made an incorrect assessment of the risks as a result." *Id.* at 515. But simply because we, in hindsight, could "agree that the decisions made were ill-advised" and "agree that [the police chief] was negligent in failing to better inform himself before making the decision," that did not mean that he callously disregarded the risk of injury to the victims. *Id.*; *see also Kerchen v. Univ. of Mich.*, 100 F.4th 751, 765 (6th Cir. 2024) (finding that where plaintiffs alleged that director of pharmacology lab did not always follow lab's plan for safe distribution of drugs, and decedent died of overdose of fentanyl that had been removed from the lab, director's behavior "sound[ed] in negligence," rather than callous disregard); *Doe*, 954 F.3d at 936 ("At most, however, the failure to take these additional precautions suggests negligence, which falls well short of establishing the required 'callous disregard for the safety' of Minor Doe." (citation omitted)).

In the present case, the district court examined the SACWIS records and Alisa's criminal history and concluded that, based on the information contained within each, the plaintiffs had not demonstrated a question of material fact concerning Von Sacken or Hickey's deliberate indifference. R.S. and T.H. press both arguments on appeal, and we analyze each one in turn.

**B.** **SACWIS records**

The district court found undisputed the fact that the SACWIS records, at the time that the plaintiffs were placed with the Haynes family, "contained no substantiated abuse or neglect allegations where Alisa Haynes was the alleged perpetrator," and only one unsubstantiated report against Anthony "as the alleged perpetrator of sexual abuse." RE 122, Op. & Order, PageID 2580. Moreover, the plaintiffs had not demonstrated that "being aware of abuse allegations that were investigated and determined to be unsubstantiated, or records on which an individual was not the alleged perpetrator of abuse were 'facts from which the inference could be drawn that a substantial

risk of harm exists.'" *Id.* at PageID 2581-82 (quoting *McQueen*, 433 F.3d at 469). The district court subsequently concluded that the plaintiffs had failed to create a genuine dispute of fact about whether Von Sacken or Hicken actually drew the requisite inference or whether it was subjectively reckless for them to have relied on "these previous investigatory determinations." *Id.* at PageID 2582.

The district court's analysis was sound. R.S. and T.H. challenge the district court's ruling on several grounds, but their arguments fail. First, the plaintiffs broadly assert that "the issue of deliberate indifference is a 'fact question for the jury to decide.'" CA6 R. 14, Appellant Br., at 13 (quoting *Nelson v. City of Madison Heights*, 845 F.3d 695, 702 (6th Cir. 2017)). But the plaintiffs overstate *Nelson*. There, whether the defendant officer had been deliberately indifferent was a fact question for the jury because, *in that case*, the officer's arguments "rel[ied] on his own testimony, which require[d] a credibility determination by the factfinder." *Nelson*, 845 F.3d at 702. We did not announce a blanket rule in *Nelson* that all questions of deliberate indifference in state-created-danger cases were for the factfinder. Here, given the undisputed facts in the record about the information contained in the SACWIS system, the district court correctly found that the plaintiffs had failed to demonstrate a genuine issue of material fact about whether Von Sacken and Hickey were deliberately indifferent.

The plaintiffs next argue that Von Sacken and Hickey were aware of specific facts from which the inference could have been drawn that the plaintiffs were at risk of being sexually abused in the Hayneses' home. They cite one record in support of this argument: the April 2004 report of alleged abuse by Anthony against his stepdaughter. But the person investigating the claim noted that the stepdaughter denied any sexual abuse, so the report was disposed of as "unsubstantiated." RE 109-12, Basic Intake Information for Anthony Haynes, PageID 2318. The plaintiffs

nevertheless argue, based on this report, that Von Sacken and Hickey "were aware of facts that showed Anthony Haynes had a history of sexually abusing children that lived with him but did nothing to follow up on those facts and ignored them." CA6 R. 14, Appellant Br., at 17. The report in question, however, showed only that allegations of sexual abuse had been *made* against Anthony, not that that abuse actually occurred and that Von Sacken and Hickey knew it. And the plaintiffs cite no caselaw supporting their argument that this report was enough to put Von Sacken and Hickey on notice of specific facts from which the inference could have been drawn that they were at risk of abuse by Anthony. *See M.F. v. Perry Cnty. Child. & Fam. Servs.*, 725 F. App'x 400, 401 (6th Cir. 2018) (adopting analysis of district court granting summary judgment for children's services agency that placed children in abusive home where "no evidence establishe[d] that the Children's Services Defendants were aware of the risk to the children while the abuse was ongoing" (citation modified)).

The plaintiffs next argue that Von Sacken and Hickey "had time to deliberate on what to do" with them after the hospital reported suspected abuse of Hubbard's infant, because the plaintiffs themselves did not present with any signs of abuse. CA6 R. 14, Appellant Br., at 15-16. But whether Von Sacken and Hickey "had time to deliberate" goes to the question of whether deliberate indifference is the correct standard in the first place. *See McQueen*, 433 F.3d at 469 (deliberate indifference is the appropriate standard where there is an "opportunity for reflection and unhurried judgments") (citation omitted). It is undisputed that deliberate indifference is the appropriate standard here.

R.S. and T.H. next contend that Von Sacken and Hicken in fact drew an inference that they could be harmed in the Haynes home but ignored it. In support, they quote extensively from Von Sacken's deposition testimony explaining that she did not take additional steps upon reading the

SACWIS history for the Hayneses, such as "contact[ing] previous victims of things that were already investigated and found not to be true," and that she saw "[n]othing [in the Hayneses' criminal history] that would exclude them from placement of these children." CA6 R. 14, Appellant Br., at 19-20 (quoting RE 106-1, Von Sacken Dep., PageID 1873-74, 1896-98). The plaintiffs also argue that Von Sacken and Hickey's statements that nothing in the SACWIS history "stood out" to them "cannot be believed" in light of the "pattern of behavior" in the Hayneses' home. *Id.* at 20. The plaintiffs posit, without citing any authority, that a jury could conclude that the "prior allegations" against the Hayneses led Von Sacken and Hickey to draw the inference of a risk of child abuse in their home. *Id.* at 21.

But this evidence does not support the conclusion that Von Sacken and Hickey actually drew an inference that a risk of harm existed. Rather, the testimony cited above simply confirms that Von Sacken did not reinvestigate prior claims of abuse and that neither Von Sacken nor Hickey saw anything in the SACWIS history that would preclude the Hayneses from accepting placement of the children. The plaintiffs point to no evidence showing that, upon review of the SACWIS records, Von Sacken and Hickey actually concluded that the children could be harmed if they were to be placed with the Hayneses.

Our decision in *R.S. I* does not mandate a contrary conclusion. In *R.S. I*, we held that, accepting as true the allegations in the pleadings, "Von Sacken was *conscious* of the risk the Hayneses posed to the children because she documented it in her report . . . [and] *disregarded* that risk because she did not follow up on critical information before recommending the placement to the juvenile court." 2022 WL 17730531, at *3, *5. We therefore reversed the district court's grant of the defendants' motion for judgment on the pleadings. *Id.* at *1, *6. Among the allegations accepted as true in *R.S. I* were the plaintiffs' claims that "Von Sacken discovered that substantiated

allegations of child sexual abuse had been made against Alisa in 2000 and 2003," and an "'indicated' child sexual abuse allegation . . . was made against Alisa in 1999." *Id.* at *1. Indeed, in *R.S. I*, the plaintiffs relied on an exhibit—attached to the operative complaint—that listed the reports of abuse in which the Hayneses were mentioned. But the document did not provide any details of the Hayneses' specific involvement in these reported instances of abuse (that is, whether they were the caretaker or alleged perpetrator). While not explicitly stated in the opinion, *R.S. I* appeared to have relied upon this vague list of reports mentioning the Hayneses, which the plaintiffs characterized as documented evidence showing the Hayneses were *known* child-abusers.

The SACWIS records relied upon in support of the summary judgment motion, however, tell a different (and more detailed) story. For the 1999 referral, Alisa was listed as the caretaker, *not* the alleged perpetrator, on the indicated sexual abuse referral. The 2000 referrals included one substantiated sexual abuse report in which Alisa was again listed as the caretaker, *not* the alleged perpetrator, and one unsubstantiated neglect referral report in which Alisa was listed in one document as "OIC" and another as "Exception." RE 109-9, Home Study for Placement of Child(ren), PageID 2279; RE 109-11, Basic Intake Information for Lisa Haynes, PageID 2207, 2210. Further, in 2003, a substantiated sexual abuse referral listed Alisa as a caretaker, *not* the alleged perpetrator. Documents produced in discovery therefore do not support the conclusion that "substantiated [or indicated] allegations of child sexual abuse had been made *against Alisa*" in 1999, 2000, and 2003. *R.S. I*, 2022 WL 17730531, at *1 (emphasis added); *cf. Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 336 (6th Cir. 2010) (explaining, in the context of a second appeal on a motion under Rule 56 following an initial appeal on a motion under Rule 12(b)(6), that "discovery will confirm the accuracy of some allegations and disprove others").

But even assuming that Von Sacken or Hickey had drawn the inference from the SACWIS records, the plaintiffs have not demonstrated that the defendants "act[ed] or fail[ed] to act in a manner demonstrating reckless or callous indifference toward the [plaintiffs'] rights." *Ewolski*, 287 F.3d at 513 (citation modified). We reasoned in *R.S. I* that Von Sacken "was required to vet and approve the placement before recommending it to the juvenile court" and that "the essence of [her] job was to protect children from neglect and abuse," so the plaintiffs had pled sufficient facts to "create the reasonable inference that Von Sacken violated their substantive due process rights." 2022 WL 17730531, at *5-6. But that decision proceeded from the allegation that Von Sacken had in her files substantiated reports of child sexual abuse *against Alisa*, an allegation that has since been disproven. This is not a case in which Von Sacken or Hickey left R.S. and T.H. in the home of known child abusers.

In the end, even if Von Sacken or Hickey could have proceeded more cautiously when deciding to place the children in the Hayneses' home—a decision that doubtless led to tragic results—their failure to do so does not meet the high bar that this court has set for callous disregard. *See, e.g.*, *Kerchen*, 100 F.4th at 765; *Doe*, 954 F.3d at 936; *Schroder*, 412 F.3d at 731; *Ewolski*, 287 F.3d at 515; *see also Lintz v. Skipski*, 25 F.3d 304, 307 (6th Cir. 1994) (in case involving social worker's alleged failure to investigate prior sexual abuse by foster parents' sons, "[t]he whole affair might have been better handled from the beginning, but that is not the issue. There must be 'deliberate indifference,' and there was none"). Von Sacken and Hickey have put forth evidence supporting their reasons for placing and keeping R.S. and T.H. with the Hayneses: namely, the facts that prior reports were unsubstantiated and that nothing in the Hayneses' criminal history would have excluded them from placement of the children. Their decision may have been flawed in hindsight, but their decisional process was not without reason based on the information

available.  *Cf. Arledge v. Franklin County*, 509 F.3d 258, 260-64 (6th Cir. 2007) (even if defendants were aware that man who shot child owned a gun and posed drug-related concerns, this did not rise to the level of deliberate indifference where state officials had inspected man's home and found it to be a "relatively happy place that was familiar to [the child]" before placing the child with man's family).

### C.     Alisa's fraud convictions

R.S. and T.H. next argue that they have presented evidence that Von Sacken and Hickey were deliberately indifferent because Von Sacken and Hickey failed to review Alisa's fraud convictions, which could have disqualified her.  The plaintiffs claim that Hubbard would not have allowed her children to be placed with the Hayneses had she known this information.  Finally, they argue that Alisa's fraud convictions "rendered any statements she made subject to scrutiny."  CA6 R. 14, Appellant Br., at 24.

But R.S. and T.H. do not cite any record evidence for their arguments that "[n]either Rebecca Von Sacken nor Sue Hickey reviewed th[e] information [about Alisa's convictions] despite having full access and the responsibility to do so," and that such convictions "could have disqualified her from allowing [the children] to be placed with her."  CA6 R. 14, Appellant Br., at 22-23.  Indeed, Von Sacken and Hickey's depositions contain no testimony to this effect.

Even assuming, as the district court did, that R.S. and T.H could support their arguments, we cannot say that Von Sacken and Hickey's knowledge that Alisa had previously been convicted of fraud-related crimes should have put them on notice of a substantial risk of later sexual abuse. We have required that the "public official . . . know of more than a *general* risk of harm" and "know of the *specific* risk that later develops." *Doe*, 954 F.3d at 933-34.  That is why, in *McQueen*, it was not enough that the teacher knew that the aggressor child had previously attacked "with

fists, feet, and pencils," because this would not have put her on notice that he posed a specific risk of bringing a gun to school and shooting a classmate. 433 F.3d at 470. Likewise, in *Doe*, that meant that school employees' prior knowledge about the fifth-grader's "poor judgment, bullying tendencies, . . . dishonesty . . . [and] reckless match-lighting" did not tend to suggest the specific risk that he posed of sexual assault. 954 F.3d at 935. And in *Range*, the morgue director's knowledge that his employee may have been abusing drugs and alcohol and having sex with live women at his worksite did not necessarily put him on notice of the specific risk that the employee would sexually abuse corpses. 763 F.3d at 579, 590-91.

So, too, here. R.S. and T.H. offer no explanation as to why Von Sacken and Hickey's knowledge of Alisa's prior fraud convictions would have put them on notice of a risk of sexual abuse by Alisa's husband ten years later. The plaintiffs offer no decision from this court that would support their argument, and they do not attempt to engage with the district court's reasoning on this point.

Again, the relevant Lucas County officials could have done more to investigate the situation before placing Hubbard's children with the Hayneses. But the question for us is not whether the officials could have done more or were negligent. *Cf. Range*, 763 F.3d at 591 ("Viewing the facts in the light most favorable to Plaintiffs, a jury could find much to condemn in the conduct of Kersker and Dr. Cleveland, perhaps even recklessness."); *Ewolski*, 287 F.3d at 515 (observing that the official at issue may have been "negligent in failing to better inform himself before making the decision"). The question is whether the officials acted with the "callous indifference" necessary to support a claim of deliberate indifference. *Doe*, 954 F.3d at 933 (citation omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate

indifference entails something more than mere negligence . . . .").  They did not, so we affirm the district court's ruling granting summary judgment to the defendants.

We make one final point on qualified immunity.  We may address the two qualified-immunity prongs in either order.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Although R.S. and T.H. have failed to show a violation of their constitutional rights, they have also failed to show that their rights were clearly established.  Demonstrating that the right was clearly established requires a plaintiff to show that the rule establishing the right is "settled," not merely "suggested by then-existing precedent," and the rule must "clearly prohibit the [official's] conduct in the particular circumstances before him."  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation modified).  "The plaintiff bears the burden of showing that the right was clearly established" and must do so by "provid[ing] on-point caselaw that would bind a panel of [the Sixth Circuit]."  *Bell v. City of Southfield*, 37 F.4th 362, 367-68 (6th Cir. 2022).  R.S. and T.H. offer no caselaw with respect to the "clearly established" analysis in their opening brief on appeal, and they conceded at oral argument that there is no case on point for their constitutional claim.  Thus, even assuming that they had shown a constitutional violation, their case would fail at the "clearly established" prong.

## II.     Motion to strike

Von Sacken and Hickey submitted the affidavits of several witnesses in support of their summary judgment motion, including the affidavits of: (1) Ryan Parker, who initially met Hubbard at the hospital, conducted background checks, and checked the SACWIS records for the Hayneses; (2) Kimberly Fraber, an LCCS case worker who investigated a claim of sexual abuse involving T.H. in April 2025; and (3) T.T., who was living with the Hayneses at the same time that Hubbard's children were.  R.S. and T.H., after filing their response to the defendants' summary judgment

motion, moved to strike these three affidavits on the ground that the witnesses were not properly disclosed to them during discovery.

The district court denied the motion. The court concluded that, even if these witnesses had not been properly disclosed under the federal rules, the violation was harmless, because the plaintiffs were well aware of these witnesses. *See* Fed. Rs. Civ. P. 26(a)(1)(A)(i), 37(c)(1).

"We review the decision to grant or deny a motion to strike for an abuse of discretion, and decisions that are reasonable, that is, not arbitrary, will not be overturned." *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 480 (6th Cir. 2003) (quoting *Collazos-Cruz v. United States*, 117 F.3d 1420, 1997 WL 377037, at *2 (6th Cir. July 3, 1997) (unpublished table decision) (per curiam)). But R.S. and T.H. fail to engage with the district court's harmlessness analysis on appeal. They simply reiterate their contention that Parker, Fraber, and T.T. were not included in the defendants' initial disclosures and complain that it was "wholly unfair" for the district court not to have stricken these witnesses' affidavits. CA6 R. 14, Appellant Br., at 25. Because R.S. and T.H. offer no argument to challenge the district court's reasoning and conclusion, we affirm the district court's denial of their motion to strike. *See Courser v. Allard*, 969 F.3d 604, 621 (6th Cir. 2020) (holding that parties forfeit arguments not raised in an opening appellate brief).

## III.     Motion for leave to conduct additional discovery

R.S. and T.H. also filed a motion for leave to conduct additional discovery. R.S. and T.H. claimed that they had not "had the opportunity to depose any of [the] fact witnesses" for whom the defendants had submitted affidavits. RE 115, Mot. for Leave to Conduct Add'l Disc., PageID 2464.

The district court denied the motion, on the basis that R.S. and T.H. had not been diligent in pursuing discovery. R.S. and T.H. had the relevant documents, which identified witnesses and

the information that each had, approximately nine months before the defendants filed their summary judgment motion in July 2024. The plaintiffs, in contrast, waited until two weeks before the close of the discovery period to serve their first set of discovery requests on the defendants.

Because Rule 56(d) "makes the trial court's allowance of additional discovery discretionary, our standard of review is abuse of discretion." *Siggers v. Campbell*, 652 F.3d 681, 695-96 (6th Cir. 2011) (quoting *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 426 (6th Cir. 2009)). But R.S. and T.H. simply argue on appeal that "there was no trial date set" and therefore "there would have been no prejudice to [Von Sacken and Hickey] if the District Court had granted the Motion." CA6 R. 14, Appellant Br., at 26. The main question, though, is not prejudice but rather whether R.S. and T.H. were diligent in pursuing discovery. *Doe v. City of Memphis*, 928 F.3d 481, 491-92 (6th Cir. 2019). The plaintiffs offer no argument that they were diligent, nor any other argument that the district court abused its discretion or otherwise erred in its analysis. We therefore affirm the district court's denial of R.S. and T.H.'s motion for leave to conduct additional discovery. *See Courser*, 969 F.3d at 621; *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019) (explaining that "[p]laintiffs forfeited this issue on appeal because they failed to discuss the district court's reasoning" in ruling on the operative motion).

## CONCLUSION

For the foregoing reasons, we affirm the district court's summary judgment order in all respects.